[Cite as *State v. Pierce*, 2010-Ohio-478.]


# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## PAULDING COUNTY


**STATE OF OHIO,**

    **PLAINTIFF-APPELLEE,**                    **CASE NO. 11-09-05**

    **v.**

**ALLAN T. PIERCE,**                          **O P I N I O N**

    **DEFENDANT-APPELLANT.**


**Appeal from Paulding County Common Pleas Court**
**Trial Court No. CR-08-594**

**Judgment Affirmed**

**Date of Decision:   February 16, 2010**


**APPEARANCES:**

    *Timothy C. Holtsberry* **for Appellant**

    *Joseph R. Burkard* **for Appellee**

Case No. 11-09-05

**SHAW, J.**

{¶1} The defendant-appellant, Allen Pierce, appeals the June 25, 2009 judgment of the Common Pleas Court of Paulding County, Ohio, finding him guilty of possession of cocaine and sentencing him to eleven months in prison.

{¶2} The facts relevant to this appeal are as follows. On the night of June 23, 2008, Trooper Joseph Sisco was dispatched to a wreck on County Road 177 in Paulding County, Ohio, near the village of Melrose. When he arrived, he saw a 1997 Ford Taurus on the west side of the road in a ditch. Although the driver of the Taurus was not present, an off-duty police officer for the Melrose Police Department, Thomas Stahl, and a tow truck driver from R&O Towing were at the scene. Stahl informed Trooper Sisco that a man was with the automobile when he happened upon it but that the man left and went to a residence a short distance away. Stahl accompanied Trooper Sisco to the residence, and Stahl identified Pierce as the individual who was with the car but had left.

{¶3} Trooper Sisco asked Pierce what had happened, and Pierce informed him that he and his wife had ran out of gas. He further explained that he pushed the vehicle off the right side of the road and that his wife had left to get "insurance records[.]" (Trial Trans. p. 78.) Trooper Sisco asked Pierce to return to his vehicle, but Pierce refused to do so. The trooper informed Pierce that a tow truck driver, who was willing to tow the car, was with Pierce's vehicle and asked him if

he had anyone else en route to tow the car. At that time, Pierce told the trooper, "Have him tow it," and then proceeded to say, "Please don't tell my wife about this." (id. at 79.) Pierce never returned to the vehicle that night.

{¶4} Trooper Sisco returned to the vehicle and informed the tow truck driver that he could tow the car. The driver then left to get a wrecker to tow it. While waiting for the wrecker, the trooper began a crash report investigation because he noticed that there was damage to the right front quarter of the car and the car did not appear to have been pushed off of the roadway because of its position in the ditch.

{¶5} After drawing a field sketch and documenting the position of the vehicle, Trooper Sisco conducted an inventory of the vehicle to document its contents for the towing company. Upon looking in the glove compartment, the trooper located a silver pipe with what appeared to be burn marks at both ends and a filter inside. Also located in the glove compartment were five compact discs, some miscellaneous papers, and Pierce's social security card. Suspecting that the silver pipe was, in fact, a crack pipe, Trooper Sisco seized the pipe and later sent it to the Ohio State Highway Patrol's criminal laboratory for testing. The car, which was registered to Pierce's wife, was then towed.

{¶6} The testing revealed that the pipe contained trace amounts of cocaine. On October 10, 2008, Pierce was indicted for one count of possession of

cocaine in violation of R.C. 2925.11(A)(1), (C)(4), a felony of the fifth degree. Thereafter, he entered a plea of not guilty, and the case proceeded to discovery.

{¶7} On March 17, 2009, the parties entered into a stipulation regarding a polygraph examination of Pierce. In this stipulation, Pierce agreed to submit to a polygraph examination by an examiner chosen by the State of Ohio. The parties also agreed that the results would be admissible at trial and that the examiner would be subject to cross-examination. This stipulation was signed by the prosecutor, Pierce's defense counsel, and by Pierce.

{¶8} Prior to taking the polygraph, the examiner, Trooper Daniel Bionci, reviewed the prosecutor's report and spoke with Pierce about the incident, asking him to tell him what occurred that night "from beginning to end." (Trial Trans. p. 102.) At that time, Pierce told Trooper Bionci that he did not know anything about the crack pipe until he was charged. During Pierce's polygraph test, he was asked approximately nine questions, with two of them being specific to the silver pipe found in the vehicle. In particular, Trooper Bionci asked Pierce the following questions:

> **"Was that your crack pipe found in that glove box?"**

> **"Was that your crack pipe found in that glove box of that Ford Taurus?"**

Pierce responded, "No," to both questions. However, the results indicated that Pierce was deceptive when he answered both of these questions.

{¶9} The case proceeded to a jury trial on May 12, 2009. The State presented the testimony of two witnesses, Trooper Sisco and Trooper Bionci, and entered four exhibits, including the results of the polygraph, in its case-in-chief.

{¶10} The defense also presented two witnesses, Stahl and Pierce, in its case-in-chief. In his testimony, Pierce stated that he drove the vehicle to a party earlier that day and that multiple individuals from the party had driven his car. As to how the vehicle ended up in the ditch, Pierce stated that his friend Miguel wanted to borrow the car, but he advised Miguel that the vehicle had little fuel. Miguel ignored his warning and proceeded to drive away in the vehicle. However, Miguel only managed to travel a short distance when the car ran out of gas. Another person at the party noticed Pierce's car stalled in the middle of the road and told him about it. Pierce and two or three of his friends then pushed the vehicle to the side of the road, where a female friend accidentally steered the car into the ditch. Pierce then contacted another friend with a truck and a tow rope to assist him. While Pierce and his friends were waiting with the car, Stahl arrived. According to Pierce, he knew nothing about the crack pipe until after his vehicle was towed. At that time, a woman named Shannon informed him that she had left her pipe in his car.

{¶11} The State recalled Stahl in its rebuttal. Stahl testified that the only people who were on the scene when he arrived were Pierce and a volunteer

fireman named Barry Brown, who had stopped to help Pierce. Thereafter, the jury returned a verdict of guilty, and a pre-sentence investigation was ordered.

{¶12} On June 25, 2009, the trial court sentenced Pierce to eleven months in prison. This appeal followed, and Pierce now asserts three assignments of error.

## ASSIGNMENT OF ERROR I

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S CRIMINAL RULE 29 MOTION FOR ACQUITTAL WHEN THE STATE FAILED TO PRESENT SUFFICIENT EVIDENCE TO SUSTAIN A CONVICTION.**

## ASSIGNMENT OF ERROR II

**THE CONVICTION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

## ASSIGNMENT OF ERROR III

**APPELLANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL.**

*First Assignment of Error*

{¶13} In his first assignment of error, Pierce asserts that the evidence was insufficient to sustain his conviction for possession of cocaine. Reviewing a challenge to the sufficiency of the evidence requires this Court to examine the evidence in the light most favorable to the prosecution. The Ohio Supreme Court has set forth the sufficiency of the evidence test as follows:

> **[A]n appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial and determine whether such evidence,**

-6-

> **if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.**

*State v. Jenks* (1991), 61 Ohio St.3d 259, 273, 574 N.E.2d 492.

{¶14} To prove the charge of possession of cocaine, the State had to show that Pierce knowingly obtained, possessed, or used a controlled substance, namely cocaine. See R.C. 2925.11(A)(1), (C)(4). Pierce maintains that the State did not prove that he "possessed" a controlled substance. Specifically, he contends that the State failed to prove possession because it did not show that he owned the vehicle, occupied the vehicle, or had the keys to the vehicle in his possession.

{¶15} The Revised Code defines "possession" as "having control over a thing or substance, but may not be inferred solely from mere access to the thing or substance through ownership or occupation of the premises upon which the thing or substance is found." R.C. 2925.01(K). The issue of whether a person charged with drug possession knowingly possessed a controlled substance "is to be determined from all the attendant facts and circumstances available." *State v. Teamer*, 82 Ohio St.3d 490, 492, 696 N.E.2d 1049, 1998-Ohio-193.

{¶16} Possession may be actual or constructive. *State v. Haynes* (1971), 25 Ohio St.2d 264, 267 N.E.2d 787. For constructive possession, the State must demonstrate that the defendant was able to exercise dominion or control over the

item, even though the item may not be within his immediate physical possession. *State v. Wolery* (1976), 46 Ohio St.2d 316, 348 N.E.2d 351; see, also, *State v. Alexander*, 8th Dist. No. 90509, 2009-Ohio-597, at ¶ 23, citing *State v. Hankerson* (1982), 70 Ohio St.2d 87, 434 N.E.2d 1362, syllabus; *State v. Messer* (1995), 107 Ohio App.3d 51, 56, 667 N.E.2d 1022. Furthermore, "[r]eadily usable drugs in close proximity to an accused may constitute sufficient circumstantial evidence to support a finding of constructive possession." *State v. Ruby*, 149 Ohio App.3d 541, 778 N.E. 2d 101, 2002-Ohio-5381, at ¶ 36; see also, *State v. Spurlock*, 3rd Dist. No. 5-03-11, 2003-Ohio-6006, at ¶ 18.

{¶17} In this case, the crack pipe containing the cocaine, along with Pierce's social security card, was found in the glove box of the vehicle. Trooper Sisco testified that Officer Stahl identified Pierce as being with the vehicle when Officer Stahl arrived. When the trooper questioned Pierce as to what happened, Pierce stated that he and his wife were going home when their vehicle ran out of gas. Although he later requested that Trooper Sisco not tell his wife, this statement did not negate his presence in the vehicle. To the contrary, it implied that Pierce's *wife* was not in the vehicle and that he was concerned that his wife would discover something negative about him and the car that was in his care. Thus, in addition to Officer Stahl's identification of Pierce as the person he saw with the car, Pierce's own statements placed him in and around the vehicle with

cocaine that was readily accessible and in close proximity to him shortly before Trooper Sisco found the crack pipe.

{¶18} Moreover, Pierce authorized Trooper Sisco to have the tow truck driver that was with the vehicle tow it. Thus, he actually exercised dominion and control over the vehicle and its contents. Further, Pierce's unwillingness to return to the car, his conflicting statements to Trooper Sisco about who was with him when the car became disabled, and his evident misrepresentations to polygraph examiner Bionci about the crack pipe that was located in the car and his knowledge of it, indicate a consciousness of guilt on Pierce's part. Thus, a rational trier of fact could have inferred from Pierce's actions that he was knowingly in possession of the crack pipe that had cocaine inside of it.

{¶19} Given this evidence and construing it in a light most favorable to the State, we find sufficient evidence in the record for a rational trier of fact to conclude that Pierce had knowledge of the cocaine, and although he did not have actual possession of the cocaine at the time the trooper arrived, he was able to exercise dominion or control over it, thus placing the cocaine within his constructive possession. Accordingly, the first assignment of error is overruled.

*Second Assignment of Error*

{¶20} Pierce also asserts that the verdict of guilty was against the manifest weight of the evidence. Unlike our review of the sufficiency of the evidence, an

appellate court's function when reviewing the weight of the evidence is to determine whether the greater amount of credible evidence supports the verdict. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541, 1997-Ohio-52. In reviewing whether the trial court's judgment was against the weight of the evidence, the appellate court sits as a "thirteenth juror" and examines the conflicting testimony. *Id.* In doing so, this Court must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the factfinder "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Andrews*, 3rd Dist. No. 1-05-70, 2006-Ohio-3764, citing *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717; *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541. Further, we must be mindful that the credibility to be afforded the testimony of the witnesses is to be determined by the trier of fact. *State v. Dye*, 82 Ohio St.3d 323, 329, 695 N.E.2d 763, 1998-Ohio-234; *State v. Frazier*, 73 Ohio St.3d 323, 652 N.E.2d 1000, 1995-Ohio-235.

{¶21} Once again, to prove the charge of possession of cocaine, the State had to show that Pierce knowingly obtained, possessed, or used a controlled substance, namely cocaine. See R.C. 2925.11(A)(1), (C)(4). Pierce maintains that the State did not prove that he "possessed" a controlled substance. Specifically, he

contends that the State failed to prove possession because it did not show that he owned the vehicle, occupied the vehicle, or had the keys to the vehicle in his possession. He further asserts that the only evidence presented demonstrated that Pierce had not driven the vehicle since earlier in the day, and several other people drove the car after him. We do not agree.

{¶22} In addition to the testimony previously discussed, Pierce bolstered the State's case through one of his own witnesses, Officer Stahl, who testified as a witness for Pierce. Officer Stahl testified that he was heading towards his home on County Road 177 when he noticed a red rotating light in the roadway. Although he was not working at the time, he had his portable radio with him but did not hear any type of emergency call. Believing someone may have needed help, he went to the scene. At the scene, he saw Pierce's vehicle in the ditch and Pierce standing beside it. He also discovered that the red rotating light was coming from the personal vehicle of a volunteer firefighter, Barry Brown, who had stopped to assist Pierce.

{¶23} When Stahl arrived, he asked if he could be of help. Brown told him that he was on his way to work when he came upon Pierce's vehicle in the ditch. Brown was afraid that Pierce's vehicle might be struck by another vehicle so he pulled over and activated his red rotating light. Stahl was also concerned that the vehicle might be struck because it was dark, the vehicle was not illuminated in any

way, and the left rear corner of the vehicle was on the roadway. Brown then notified the sheriff's office to send someone out to the scene and informed them that a tow was needed. At that time, the sheriff's office told him that a highway patrol officer was en route.

{¶24} Shortly after Stahl arrived, Brown informed him that he had to be at work and asked if Stahl would wait until someone came to assist Pierce in removing his vehicle from the ditch. Brown then left the scene, and Stahl began speaking with Pierce. Believing that Pierce had driven off the roadway, Stahl asked him if he needed any medical attention. Pierce told him that he did not and then proceeded to tell him that he was coming from a party down the road, ran out of gas, and was pushing his vehicle off the roadway when it dropped into the ditch. Specifically, Pierce told Stahl that he was driving the vehicle. He also never mentioned that his wife was with him.

{¶25} When Stahl informed Pierce that he was the village police officer for Melrose, Pierce's attitude changed. He became irritated and evasive, began using expletives, did not want to speak to Stahl any longer, wanted to leave the scene, and tried to walk away twice. Stahl advised him not to leave because a trooper was en route. However, shortly thereafter, another vehicle occupied by two or three other individuals arrived at the scene and the driver asked Pierce, "What's going on?" Pierce stated, "Come on, let's get the 'F' out of here," entered the

vehicle, and left. (Trial Trans. p. 138.) The tow truck driver and Trooper Sisco arrived a few minutes later.

{¶26} Stahl also testified that no one else, other than Brown, who was seated in his truck, was with Pierce when he arrived. He further stated that he walked around the vehicle to see if there was any damage to the vehicle. When he did, he noticed that there was nothing about the crops in the field next to the ditch or the high grass in the ditch that would indicate that anyone exited the passenger door.

{¶27} As previously noted, Pierce's trial testimony was significantly different from the testimony of Trooper Sisco and Officer Stahl. However, his testimony further placed him in control of the vehicle and its contents. For instance, he testified that he had clothes and tools of his in the vehicle and that he knew that there were compact discs in the glove box because that was where he kept them. He also knew the glove box contained the registration and insurance documents for the vehicle and that he put his social security card in the glove box for some unknown reason. Also, despite the fact that the vehicle was registered in his wife's name, he testified that *he* did not want it any more and that *he* took it to Miguel's home because *he* was going to sell it to Miguel's aunt. Thus, Pierce's testimony demonstrated how expansive Pierce's dominion and control over the vehicle and its contents was.

{¶28} Furthermore, not only did Pierce's trial testimony differ from the prior statements he made, his trial testimony also contained various inconsistencies. For instance, Pierce testified that he called a friend to pull the vehicle out of the ditch and that his friend had just arrived when Stahl appeared at the scene. Nevertheless, he later testified that his friend told him that he would pull Pierce's vehicle out of the ditch when he was done at work and for Pierce to go ahead and go home. In addition, Pierce testified in his direct examination that he had one prior felony conviction for operating a motor vehicle while intoxicated. However, during cross-examination, the prosecutor questioned Pierce about two judgment entries of conviction, both for operating a motor vehicle while intoxicated. Pierce maintained that they were from one incident, but the entries demonstrated that they were two separate offenses that occurred two years apart from one another. (See State's Exhibits 5 & 6.)

{¶29} Pierce also admitted that he was employed as a certified nurse's assistant, was in college studying to be a licensed practical nurse, hoped to one day be a registered nurse, and that he would lose "all certification for everything" if he was convicted of a drug offense. (Trial Trans. p. 161.) Thus, he had a motive to fabricate his testimony in order to avoid a drug conviction.

{¶30} Apparently, the jury did not find the bulk of Pierce's testimony credible. We cannot find that the jury clearly lost its way in this regard. Not only

did the majority of his testimony directly conflict with the testimony of Trooper Sisco and Officer Stahl, the polygraph examination showed that he was deceptive in his responses to Trooper Bionci's questions. He also had a motive to fabricate his testimony as he stood to lose his professional certification, possibly his employment, and his hopes of one day becoming a licensed practical nurse and later a registered nurse.

{¶31} In short, the more credible testimony placed Pierce as the driver and sole occupant of that vehicle when it became disabled, which would have placed him in close proximity to readily available cocaine. Further, his own testimony illustrated his dominion and control over the vehicle and his knowledge of the contents of that vehicle, particularly the glove box. Thus, a reasonable inference could be made that he knew the crack pipe and cocaine inside it were also in the glove box of that vehicle. Given all of the testimony, we cannot find that the jury clearly lost its way and created a manifest miscarriage of justice by rendering a verdict that was against the manifest weight of the evidence. Accordingly, the second assignment of error is overruled.

*Third Assignment of Error*

{¶32} Pierce's final assignment of error concerns the performance of his trial counsel. Specifically, Pierce asserts that his trial counsel was ineffective by failing to file a motion to suppress the search of his vehicle. In support, he

contends that the search was non-consensual, no evidence was provided that it was conducted pursuant to any policy of the highway patrol, and that any policy authorizing an inventory search for any disabled vehicle is unreasonable in violation of the Fourth Amendment.

{¶33} Our review of these issues begins by noting that attorneys licensed by the State of Ohio are presumed to provide competent representation. *State v. Hoffman* (1998), 129 Ohio App.3d 403, 407, 717 N.E.2d 1149. An ineffective assistance of counsel claim requires proof that trial counsel's performance fell below objective standards of reasonable representation and that the defendant was prejudiced as a result. *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus. As to the first prong of the test, courts are to afford a high level of deference to the performance of trial counsel. *Bradley*, 42 Ohio St.3d at 142, 538 N.E.2d 373. To show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, but for counsel's errors, the outcome at trial would have been different. *Id.* at paragraph three of the syllabus. "Reasonable probability" is a probability sufficient to undermine confidence in the outcome of the trial. *Id.* at 142.

{¶34} The United States Supreme Court has held that the "failure to file a suppression motion does not constitute per se ineffective assistance of counsel."

*Kimmelman v. Morrison* (1986), 477 U.S. 365, 384, 106 S.Ct. 2574, cited in *State v. Madrigal*, 87 Ohio St.3d 378, 389, 721 N.E.2d 52, 2000-Ohio-448.  There must also be a reasonable probability that the motion will be successful.  See *State v. Robinson* (1996), 108 Ohio App.3d 428, 433, 670 N.E.2d 1077; *State v. Ligon* , 3rd Dist. No. 4-2000-25, 2001-Ohio-2231.   Thus, this Court's determination of whether counsel for Pierce was ineffective relies upon whether there was a reasonable probability that a motion to suppress in this case would have been successful.

{¶35} The Fourth Amendment provides:  "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."   The crux of the Fourth Amendment is the reasonableness of a search.  See *Cady v. Dombrowski* (1973), 413 U.S. 433, 439, 93 S.Ct. 2523.

{¶36} The United States Supreme Court has noted that "[i]nventory searches are now a well-defined exception to the warrant requirement of the Fourth Amendment."  *Colorado v. Bertine* (1987), 479 U.S. 367, 371, 107 S.Ct. 738, citing *Illinois v. Lafayette* (1983), 462 U.S. 640, 643, 103 S.Ct. 2605; *South Dakota v. Opperman* (1976), 428 U.S. 364, 367-376, 96 S.Ct. 3092.   In

*Opperman*, the Court, in discussing the administrative inventory of a vehicle,

stated:

> **In the interests of public safety and as part of what the Court has called 'community caretaking functions,' automobiles are frequently taken into police custody. Vehicle accidents present one such occasion. To permit the uninterrupted flow of traffic and in some circumstances to preserve evidence, disabled or damaged vehicles will often be removed from the highways or streets at the behest of police engaged solely in caretaking and traffic-control activities. Police will also frequently remove and impound automobiles which violate parking ordinances and which thereby jeopardize both the public safety and the efficient movement of vehicular traffic. The authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge." (Citations and footnote omitted.)**

*Opperman*, 428 U.S. at 368-369, 96 S.Ct. at 3097. The Court noted that the

purpose of the inventory also protects an owner's property, insures against claims

of lost, stolen, or vandalized property, and guards the police from danger. *Id*.

However, in making a determination whether an administrative inventory was

reasonable, the Court has repeatedly relied upon whether the law enforcement

official was acting in accordance with established policy and procedure. See

*Bertine*, supra; *Lafayette*, supra; *Opperman*, supra.

{¶37} At trial, Officer Stahl testified that the location of Pierce's vehicle

was a hazard because it was dark outside, the vehicle was not illuminated in any

way, and the left rear corner of the vehicle was on the roadway. In addition,

Pierce testified that he called a friend to assist him in towing the vehicle because

he "didn't want nobody to hit it." (Trial Trans. p. 142.) He further stated that "I didn't want another car to come by, because they drive by there kind of fast. Somebody might not have saw it. They could have hit that car[.]" (id. at 143.) Trooper Sisco testified that he performed an administrative inventory search on Pierce's vehicle after Pierce stated that the driver from R&O Towing, who was at the scene, could tow it and after Pierce refused to return to the scene.

{¶38} Given these circumstances, the vehicle's location created a threat to public safety. Thus, the trooper, in exercising his community care-taking function, made a reasonable decision that the vehicle needed to be towed to a safe location. Further, when Pierce refused to return to the vehicle to handle this matter and told the trooper to have the tow truck driver tow it, he placed the responsibility of the vehicle with the trooper. Thus, the issues attendant to an inventory search, i.e. to protect an owner's property, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger, were implicated.

{¶39} Nevertheless, Pierce maintains that there was no evidence of the Ohio State Highway Patrol's policy on administrative inventories in order to determine whether Officer Sisco adhered to any such policy or if the inventory was merely a pre-text to search the vehicle for contraband. The only evidence in the record explaining the inventory came from Trooper Sisco, who stated:

> **The administrative inventory is an itemized document showing the vehicle, who was driving, the vehicle owner's information**

**and all the items that are located in the vehicle where they're located at. We do that for two reasons. One, it documents all the stuff that's in there. It protects the person whose vehicle it is, it also protects the towing service in case something would come up missing.**

(Trial Trans. p. 81.)

{¶40} Clearly, at trial, the State was not focused on the policy and protocols for administrative inventories as this was not a suppression hearing. Thus, we are limited to this evidence. However, he used the term "we" in explaining why administrative inventories are performed. He also was very specific in what had to be contained within the inventory document, and he detailed for the jury how he conducted the inventory search. This testimony implies that Trooper Sisco was acting in accordance with departmental requirements, which could have been further delineated if an issue had been raised. Further, the Ohio State Highway Patrol, a state-run agency, handles a significant amount of cases involving vehicles whether the vehicles are involved in an accident, disabled, or part of a traffic offense. Thus, it seems implausible that OSHP would not have a standardized policy for inventory searches in effect.

{¶41} For these reasons, we cannot find that there was a reasonable probability of success on a motion to suppress if trial counsel had filed one. Therefore, we do not find that trial counsel was ineffective for failing to do so, and the third assignment of error is overruled.

{¶42} Based on the foregoing, we affirm the judgment of the Common Pleas Court of Paulding County, Ohio.

*Judgment Affirmed*

**WILLAMOWSKI, P.J., concurs in Judgment Only.**
**ROGERS, J., concurs.**
**/jlr**

.