[Cite as *State v. Neal*, 2016-Ohio-3282.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## CRAWFORD COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLEE,           CASE NO. 3-15-13

      v.

KENAN C. NEAL,                     O P I N I O N

      DEFENDANT-APPELLANT.

STATE OF OHIO,

      PLAINTIFF-APPELLEE,            CASE NO. 3-15-14

      v.

KENAN C. NEAL,                     O P I N I O N

      DEFENDANT-APPELLANT.

Appeals from Crawford County Common Pleas Court
Trial Court Nos. 14-CR-0262 and 15-CR-0062

Judgments Affirmed

Date of Decision: June 6, 2016

APPEARANCES:

    *Adam Charles Stone* for Appellant

    *Ryan M. Hoovler* for Appellee

**ROGERS, J.**

{¶1} Defendant-Appellant, Kenan Neal, appeals the judgments of the Court of Common Pleas of Crawford County convicting him of three counts of possession of drugs and one count of receiving stolen property, sentencing him to 10 years in prison, and imposing a $5,000 mandatory fine. On appeal, Neal argues that his convictions are based on insufficient evidence and against the manifest weight of the evidence. For the reasons that follow, we affirm the judgments of the trial court.

{¶2} On December 9, 2014, the Crawford County Grand Jury indicted Neal on one count of possession of cocaine in violation of R.C. 2925.11(A) and 2925.11 (C)(4)(e), a felony of the first degree. On March 9, 2015, the Crawford County Grand Jury indicted Neal on two counts of possession of oxycodone in violation of R.C. 2925.11(A) and 2925.11 (C)(1)(a), a felony of the fifth degree; one count of possession of methadone in violation of R.C. 2925.11(A) and 2925.11 (C)(1)(a), a felony of the fifth degree; and one count of receiving stolen property in violation of R.C. 2913.51(A) and 2913.51(C), a felony of the fourth degree.[1] The charges arose after authorities searched Neal's home and found cocaine, pills, and a stolen firearm.

---

[1] The two cases were later consolidated into case number 14CR0262.

{¶3} On July 14, 2015, the case proceeded to trial, where the following evidence was presented.

{¶4} Officer Jeremy Mohn of the Ontario Police Department was the first witness to testify. He stated that between March 2010 and April 2013, he was an officer with the Crestline Police Department ("the Department"), and in April 2013, he was promoted to detective. He added that on November 10, 2014, he was the Department's active detective.

{¶5} Officer Mohn testified that he began investigating Neal in 2011 after the Department received complaints of drug-related activity occurring at Neal's home. He stated that while surveilling Neal's home, he noticed signs indicative of drug-related activity, particularly with regard to the traffic patterns of Neal's visitors. Despite these signs, Officer Mohn testified that he was never able to get enough evidence to obtain a search warrant.

{¶6} Officer Mohn testified that in the fall of 2014, Neal moved to another home in Crestline and between August 2014 and November 2014, there were "numerous incidents of traffic coming to the back of the residence, through the alleyway, stopping and being there for a few minutes, going to the backdoor, and then leaving again." Trial Tr., p. 120.

{¶7} Office Mohn testified that on the evening of November 10, 2014, he learned that Neal's residence had been burglarized and one of the suspects, later

identified as Toi Pickens, had been apprehended. He learned that Pickens invaded Neal's residence in order to "rob [Neal] of drugs and money that was supposedly in [Neal's] house." *Id.* at p. 124. He further learned that Pickens was caught with a stolen firearm that Pickens claimed to have taken directly from Neal. He learned that the stolen firearm was one of multiple firearms stolen during a home invasion in Bucyrus and that Pickens claimed to have observed an additional firearm in Neal's home. Officer Mohn stated that with this information, he was able to obtain a warrant to search Neal's residence.

{¶8} Office Mohn testified that Neal and his wife were present at Neal's residence when the warrant was served and executed.[2] He stated that they appeared shocked at first and "then it turned into an agitated 'F this, F that, I don't need you.' " *Id.* at p. 129. He added that Neal was eventually removed from the premises because of safety concerns.

{¶9} Officer Mohn testified that the main living area and an upstairs bedroom were the first rooms searched. Officer Mohn testified that as he was speaking with Neal, Officer Eshelman informed him that a closet door in the upstairs bedroom was locked. He stated that Officer Eshelman inquired about a key but was told there was none. He added that once the fire department was called, "[Neal's wife] advised that there were keys and she requested [Neal] to

---

[2] The record contains conflicting evidence as to whether the female present at the home was Neal's wife or fiancé. Neal testified, however, that the female was his wife, and therefore, we will refer to her as such.

give us the key that way no damage had to be done to the residence." *Id*. at p. 132. He stated that Neal gave him a keyring, which was located on a table in the front dining room. He added, "[Neal] was asked if there was anybody else [sic] or any other keys, he advised, no, there were no other keys, he was the only one to hold the key and he was the only one to have access to that room." *Id*. at p. 132.

{¶10} Officer Mohn testified that inside the closet was a safe. He stated that another key on the keyring opened the safe and inside the safe were two bags: one bag contained $9,700 in cash and the other bag contained a large white rock substance, later identified as 37.75 grams of cocaine.

{¶11} Officer Mohn testified that inside that bedroom's dresser drawer was a nine-millimeter, semi-automatic firearm and ammunition. He explained that the firearm's serial number was run through LEADS, and the report confirmed that the firearm, along with two others, had been stolen during a home invasion in Bucyrus. He added that the drawer also contained several tablets, later identified as oxycodone and methadone; a plate, with reside on it; and a straw.

{¶12} Officer Mohn stated that the bedroom also contained a laptop and a television hooked up to two surveillance cameras capturing an adjacent alleyway and the home's back door. Officer Mohn stated that inside a cabinet next to the back door, they found a large, white rock, later identified as 23.19 grams of

cocaine; sandwich bags; scales; a razor blade; and a plate. He added that these tools are often used to cut and distribute drugs.

{¶13} Officer Mohn testified that while the search was underway, he spoke to Neal and his wife. He explained, "[Neal] had approached me basically and in reference to doing things to assist [the Department] at that point in time in reference to other potential drug traffickers or people in possession of drugs at that point." *Id*. at p. 165. Office Mohn stated that Neal "did not directly express why he wanted to give that information, other than he wanted to provide information at that point in time so that that [sic] way [sic] maybe help out his case." *Id*. Officer Mohn stated that he told Neal they would discuss things back at the Department.

{¶14} Officer Mohn testified that before taking Neal to the Department, Neal "again approach[ed] me in reference to talking to officers, myself in particular, in reference to helping out [sic] providing information on his behalf." *Id*. at p. 169. Officer Mohn added that in his experience, people offer information in order to receive a lesser sentence. He added that Neal also requested to see his daughter before he left, which he allowed.

{¶15} Officer Mohn testified that back at the Department, Neal waived his *Miranda* rights and spoke with him for approximately one hour. He explained that during their conversation, Neal provided information on numerous drug dealers and traffickers and stated that his home was broken into because people were

trying to "take over portions of his territory" in order to be a "bigger organization." *Id*. at p. 174. He stated that Neal also admitted to purchasing the firearm found on Pickens and the firearm found in the upstairs bedroom from a female who lived at the Galion Arms Apartments and recalled the female selling a third firearm to an individual from Mansfield. He added that Neal also admitted that he took Percocet.

{¶16} Officer Scott Eshelman of the Crestview Police Department was the second witness to testify. Officer Eshelman testified that he responded to a 9-1-1 call at Neal's residence on the evening of November 8, 2014. He explained that when he arrived at the residence, Neal stated that two, armed, black males had broken into his home, tied up his wife, and took him to the upstairs bedroom to look for something. A fight ensued, however, and the men fled.

{¶17} Officer Eshelman testified that Pickens was later apprehended and stated he had been recruited to break into Neal's house to rob him of "$20,000 in cash and possibly some heroin and crack cocaine." *Id*. at p. 196. He explained that a firearm was found on Pickens, and Pickens claimed to have taken the firearm from Neal. Officer Eshelman testified that the firearm was run through LEADS and "came back out of a burglary out of Bucyrus a short time before this incident, it came back stolen essentially." *Id*. at p. 197. He stated that he

informed Officer Mohn of these events, and a warrant was obtained to search Neal's residence.

{¶18} Officer Eshelman testified that executing the search warrant was a unique situation because they believed there were children in the residence. He explained that he told Neal and his wife that "[he] was there to do a follow-up investigation in reference to the burglary." *Id*. at p. 200. He stated that "[he] thought it would be safer to approach that that [sic] way since there was [sic] children in the house, that way there wasn't a, you know, a technical assault on the * * * house." *Id*. Officer Eshelman testified that after serving the search warrant and securing the area, Neal asked to talk to Officer Mohn, and the two went outside.

{¶19} Officer Eshelman stated that during his search of the upstairs bedroom, he encountered a locked closet door. He stated that when he asked Neal for the key, Neal "got upset, repeatedly stat[ed] no, he was pacing back and forth." *Id*. at p. 202. Officer Eshelman stated that eventually Neal's wife asked Neal to "just give [them] the key so [they] d[o not] tear up the house." *Id*. at p. 202-203. He stated that Neal was "reluctant" but ended up giving them a keyring. *Id*. at p. 203. Officer Eshelman added that he did not hear Neal being asked any questions about the key.

{¶20} Officer Eshelman testified that inside the closet door was a safe. He stated that he opened the safe with another key on the keyring and inside the safe were two bags: one bag contained $9,700 and a title to a vehicle, and the other bag contained a large white rock. He testified that he also found a firearm; some prescription pills; a plate with some powder residue on it; and a straw in a dresser drawer. He stated that the dispatch center ran a check on the firearm's serial number and "it came back again stolen." *Id*. at p. 207. Specifically, he stated that the firearm's serial number matched the serial number of a firearm stolen during a burglary in Bucyrus.

{¶21} Officer Eshelman stated that there was also a television hooked up to a security system. He explained that the system consisted of two cameras, one capturing the back alley and one capturing the laundry room's backdoor. He stated that he collected the cameras and searched the laundry room. He stated that in the laundry room, near a microwave and a large cabinet, he found "another plate with residue on it, electronic scales with residue, and * * * another large rock and some smaller rocks suspected to be cocaine." *Id*. at p. 210-211.

{¶22} Officer Eshelman testified that he and Officer Mohn spoke with Neal at the Department. He stated that they spoke to Neal in order to "try[] to get further information on other drug activity in the city." *Id*. at p. 212. He stated that Neal waived his *Miranda* rights and made a voluntary statement. Officer

Eshelman testified that Neal stated he believed he was set up by former partners who wanted to grow their drug operation as big as his. He stated that Neal admitted to "mainly run[ning] in * * * rock and crack cocaine." *Id*. at p. 215. Officer Eshelman stated that he did not ask Neal if the drugs found in his house were his because

> he had the keys to - - we found the crack cocaine essentially behind two locked doors that he possessed * * * the keys for. It was in his room where he says he stays. The layout of the upstairs, it was clear that - - I'm not sure if it's considered a two or three bedroom, because the other two bedrooms are kinda odd shaped, but there is [sic] three beds. There's three beds upstairs, there's [Neal's] room, which is clear, there's the bed, the t.v., and other items. The other two beds contained a mixture of adult female items and child items.

*Id*. at p. 215-216. He added that Neal admitted to buying pills from someone in Crestline.

{¶23} Officer Eshelman testified that Neal also admitted that he had purchased two firearms from "Mama." He stated that Neal identified where "Mama" lived and the type of car she drove. He added that Neal also recalled "Mama" selling a third firearm to an individual from Mansfield and identified the individual's first name and vehicle description.

{¶24} Erica Foster was the last witness to testify in the State's case-in-chief. She testified that in December 2014 she worked as an intake caseworker with the Crawford County Children Services. She stated that as a caseworker, it was her job to investigate cases of child abuse and neglect. She stated that she

-10-

received a complaint from the Crestline Police Department "that there was drug use potentially in the home as well as substances found in the home." *Id*. at p. 230.

{¶25} Foster stated that on December 23, 2014, she went to the Crawford County Jail to interview Neal. She explained, "I have a mandate by the State that I have to complete interviews with all parties involved, so anytime someone is an alleged for [sic] perpetrator in a case, if possible at all, we have to complete an interview with that person." *Id*. at p. 222-223. She added that she was not working on behalf of any police agency. She testified that she did not recall whether she asked Neal what he was charged with; she explained, "I was more trying to determine what was in the home that the child could have been exposed to." *Id*. at p. 230-231.

{¶26} Foster testified that during her conversation with Neal, Neal admitted that there was cocaine and Percocet in his residence and that he used it for his own personal use. He added that "it was not [for his wife's] use at all." *Id*. at p. 224. Foster testified that when she asked Neal where the cocaine and Percocet were stored, he stated that it was locked away upstairs in a back room. She added that Neal never indicated that anyone else used the cocaine or that the cocaine had been planted. Upon conclusion of Foster's testimony, the State rested.

{¶27} Neal testified as the defense's sole witness. He testified that on November 8, 2014, two armed men entered his home, pistol whipped him, and tied up his wife. He stated that he did not know or recognize the men and never found out who they were. He testified that at that time he was not employed because he was going through a workers compensation claim. He added that he recently received a $10,000 settlement, which he put in his safe because he and his wife were planning a vacation.

{¶28} Neal testified that when Officer Eshelman arrived at his home on November 10, 2014, Officer Eshelman "had me believing that he came there for the follow-up on a home invasion." *Id.* at p. 251. He stated that when his wife opened the door, Officer Eshelman informed him that he had a search warrant related to drug trafficking. Neal testified that he told Officer Eshelman, "what do you mean, I never saw drugs in my life?" *Id.*

{¶29} Neal testified that while the officers were searching his home, Officer Mohn called him outside and said "If you scratch my back, I'll scratch your back." *Id.* at p. 255. He testified that Officer Mohn asked him if he knew of any drug activity, and he told Officer Mohn about several individuals who he heard sold drugs.

{¶30} Neal testified that the upstairs bedroom was a spare bedroom, where he kept some of his personal belongings, including his clothing, safe, and

surveillance equipment. He stated that when the officers asked him for a key to his safe, he told them it was on the bed. He explained that he "ha[d] no knowledge of the cocaine being there * * * before the officer made it into the house." *Id.* at p. 253. He added that he did not recall the Percocet, methadone, or firearm being in the home. Neal further testified that he did not recall making any statements to Officer Mohn and Officer Eshelman at the Department.

{¶31} Neal testified that when he spoke with Foster, she "accused [him] of selling drugs, moving drugs out of the house, [sic] neglecting [his] child." *Id.* at p. 254. He stated that she told him that the Department had found drugs in his safe. Neal stated that when he told Foster he did not know what she was talking about, she replied, "Well, I'm paying for the police [sic] face value and I'm going with that." *Id.* at p. 255. At the conclusion of Neal's testimony, the defense rested.

{¶32} Thereafter, the State re-called Officer Mohn, and he authenticated the audio recording of Neal's interview at the Department. The interview was played for the jury and admitted into evidence.

{¶33} Ultimately, the jury found Neal guilty on all counts, and the trial court sentenced him to a total of 10 years in prison.

{¶34} It is from these judgments that Neal appeals, presenting the following assignments of error for our review.

*Assignment of Error No. I*

**THE TRIAL COURT JURY VERDICT THAT APPELLANT WAS GUILTY OF POSSESSION OF DRUGS AND RECEIVING STOLEN PROPERTY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

*Assignment of Error No. II*

**THE EVIDENCE AGAINST THE APPELLANT WAS LEGALLY INSUFFICIENT TO SUPPORT THE JURY'S GUILTY VERDICT.**

{¶35} Due to the nature of Neal's assignments of error, we elect to address them out of order.

*Assignment of Error No. II*

{¶36} In his second assignment of error, Neal argues that the trial court erred in entering verdicts that were not supported by sufficient evidence. Specifically, Neal argues that the State failed to present sufficient evidence that he knowingly possessed the cocaine, pills, and stolen firearm.[3] We disagree.

{¶37} When an appellate court reviews the record for sufficiency, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt. *State v. Monroe*,

---

[3] Neal's sufficiency challenge is limited to the issue of whether he knowingly possessed the drugs, pills, and stolen firearm. He does not challenge, for example, whether there was sufficient evidence to establish that he knew or should have known that the firearm was obtained through the commission of a theft offense or whether the drugs and pills were controlled substances or controlled substance analogs within the meaning of R.C. 2925.11.

105 Ohio St.3d 384, 2005-Ohio-2282, ¶ 47. Sufficiency is a test of adequacy. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997), *superseded by constitutional amendment on other grounds as stated in State v. Smith*, 80 Ohio St.3d 89 (1997). Accordingly, the question of whether the offered evidence is sufficient to sustain a verdict is a question of law. *State v. Wingate*, 9th Dist. Summit No. 26433, 2013-Ohio-2079, ¶ 4.

**{¶38}** R.C. 2925.11(A) provides, "No person shall knowingly obtain, possess, or use a controlled substance or a controlled substance analog." R.C. 2913.51 provides, "No person shall receive, retain, or dispose of property of another knowing or having reasonable cause to believe that the property has been obtained through commission of a theft offense."

**{¶39}** A person acts knowingly "when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist * * *." R.C. 2901.22(B). "Knowledge must be determined from all the facts and circumstances surrounding the incident." *State v. Williams*, 2nd Dist. Montgomery No. 20271, 2005-Ohio-1597, ¶ 37, citing *State v. Teamer*, 82 Ohio St.3d 490 (1998).

**{¶40}** "Possession" is defined as "having control over a thing or substance, but may not be inferred solely from mere access to the thing or substance through

ownership or occupation of the premises upon which the thing or substance is found." R.C. 2925.01(K). "Possession may be actual or constructive." *State v. Pierce*, 3rd Dist. Paulding No. 11-09-05, 2010-Ohio-478, ¶ 16, citing *State v. Haynes*, 25 Ohio St.2d 264 (1971). To establish constructive possession, the State must show that "the defendant was able to exercise dominion or control over the item, even though the item may not be within his immediate physical possession." *Pierce* at ¶ 16, citing *State v. Wolery*, 46 Ohio St.2d 316 (1976). "Dominion and control may be proven by circumstantial evidence alone." *State v. Graziani*, 3rd Dist. Defiance No. 4-10-01, 2010-Ohio-3550, ¶ 13, citing *State v. Trembly*, 137 Ohio App.3d 134, 141 (8th Dist.2000).

**{¶41}** Here, Neal argues that the State failed to present sufficient evidence that he knowingly possessed the cocaine, pills, and stolen firearm because "access to the area in which the contraband was found does not equate to him having any ability to exercise control over it." Appellant's Brief, p. 11-12. However, Officer Mohn testified that Neal stated he was the *only one* to have access to the upstairs bedroom, where cocaine, pills, and the stolen firearm were found. Officer Mohn and Officer Eshelman also testified that Neal provided them with the keys to the bedroom's locked closet door, which Neal indicated he was "the only one to hold." *Id.* at p. 132. Inside the closet was a safe, which was opened by another key on the keyring; the safe contained cocaine.

-16-

**{¶42}** Officer Eshelman testified that during their interview with Neal, Neal admitted to "running" cocaine. *Id*. at p. 215. The officers also testified that Neal admitted to purchasing the firearms from "Mama" and buying pills. Foster also testified that Neal admitted there was cocaine and Percocet in the upstairs of his home. She added that Neal stated it was for his personal use and "not [for his wife's] use at all." *Id*. at p. 224.

**{¶43}** The officers further testified that the upstairs bedroom contained a television linked to two surveillance cameras: one camera captured the alleyway and one camera captured the back door. They added that inside the back door, they found cocaine and other apparent drug paraphernalia.

**{¶44}** Construing this evidence in a light most favorable to the State, we find sufficient evidence in the record for a rational trier of fact to conclude that Neal knowingly possessed the cocaine, pills, and firearm within the meaning of the statutes. Officer Mohn's testimony concerning Neal's control over the bedroom and key was sufficient to establish that Neal constructively possessed the safe (i.e., the cocaine), the contents of the drawer (i.e., the pills and firearm), and the surveillance equipment (i.e., the television, laptop, and surveillance cameras). The testimony concerning the surveillance camera's location in relation to the cocaine found in the laundry room, coupled with the testimony concerning Neal's

inculpatory statements, was sufficient to establish that Neal constructively possessed the cocaine found in the laundry room.

**{¶45}** Accordingly, we overrule Neal's second assignment of error.

*Assignment of Error No. I*

**{¶46}** In his first assignment of error, Neal argues that the trial court erred in entering verdicts that were against the manifest weight of the evidence. Specifically, Neal argues that the jury clearly lost its way in finding that Neal constructively possessed the cocaine, pills, and stolen firearm.[4] We disagree.

**{¶47}** When an appellate court analyzes a conviction under the manifest weight standard, it "sits as the thirteenth juror." *Thompkins*, 78 Ohio St.3d at 387. Accordingly, it must review the entire record, weigh all of the evidence and its reasonable inferences, consider the credibility of the witnesses, and determine whether the fact finder "clearly lost its way" in resolving evidentiary conflicts and "created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). When applying the manifest weight standard, a reviewing court should only reverse a trial court's judgment "in exceptional case[s]" when the evidence "weighs heavily against the conviction." *Id.* at paragraph three of the syllabus.

---

[4] Again, Neal's manifest weight challenge is limited to the issue of whether he knowingly possessed the drugs, pills, and stolen firearm.

**{¶48}** Here, whether the verdicts were against the manifest weight of the evidence turns on the credibility of the witnesses. "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. In other words, "jurors are entitled to believe the testimony offered by the State's witnesses." *State v. Wareham*, 3d Dist. Crawford No. 3-12-11, 2013-Ohio-3191, ¶ 25, citing *State v. Bates*, 12th Dist. Butler No. CA2009-06-174, 2010-Ohio-1723, ¶ 11.

**{¶49}** As explained above, Officer Mohn testified, "[Neal] was asked if there was anybody else [sic] or any other keys, he advised, no, there were no other keys, he was the only one to hold the key and he was the only one to have access to [the bedroom]." *Id*. at p. 132. Inside the bedroom, officers found cocaine, pills, and a stolen firearm. Officers also found cocaine near the back door, which was monitored by Neal's surveillance equipment.

**{¶50}** Although Neal testified on his own behalf and denied knowledge of the cocaine, pills, and stolen firearm, he failed to provide any explanation—other than the implication that he was framed—as to how the cocaine, pills, and stolen firearm got inside his home. While Neal suggests in his brief that the contraband could have belonged to his wife, Foster testified that Neal stated the cocaine and Percocet *did not* belong to wife.

{¶51} Moreover, Neal's recorded statement to Officer Mohn and Officer Eshelman casts doubt on the credibility of Neal's testimony. There, Neal stated that his home was invaded in connection with his drug operation. He explained that the market was "tight" and other dealers and traffickers were trying to get him "out of the way" so they could "get to where [he] was at." State's Exhibit 16, 8:30-9:13. He also admitted to buying pills, admitted to buying the firearms from "Mama," and provided detailed information on numerous drug dealers and traffickers, including his former partners.

{¶52} Given the State's evidence and the inconsistencies between Neal's testimony and his statement to Officer Mohn and Officer Eshelman, we cannot say that this is the exceptional case where the trier of fact lost its way and committed a miscarriage of justice in finding Neal guilty of these offenses.

{¶53} Accordingly, we overrule Neal's first assignment of error.

{¶54} Having found no error prejudicial to the appellant, in the particulars assigned and argued, we affirm the judgments of the trial court.

*Judgments Affirmed*

**SHAW, P.J. and PRESTON, J., concur.**

**/jlr**