[Cite as *State v. Newsome*, 2012-Ohio-6119.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## PUTNAM COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,           CASE NO. 12-12-03

    v.

JOSHUA LEE NEWSOME,           O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Putnam County Common Pleas Court
Trial Court No. 2011 CR 72

**Judgment Affirmed**

Date of Decision:   December 26, 2012

APPEARANCES:

    *Charles R. Hall, Jr. and Randy F. Hoffman* for Appellant

    *Todd C. Schroeder* for Appellee

**ROGERS, J.**

{¶1} Defendant-Appellant, Joshua Newsome, appeals the judgment of the Court of Common Pleas of Putnam County finding him guilty of robbery and sentencing him to an eight-year prison term.  On appeal, Newsome contends that the verdict was against the manifest weight of the evidence, that the trial court committed numerous evidentiary errors, that he was denied effective assistance of counsel, that the trial court erred when it sentenced him to the maximum term of imprisonment, and that the trial court erred when it informed him of the consequences of violating post-release control.  Based on the following, we affirm the trial court's judgment.

{¶2} On October 11, 2011, the Putnam County Grand Jury indicted Newsome on one count of robbery in violation of R.C. 2911.02(A)(2), a felony of the second degree.  The indictment stems from a robbery of a local convenience store by two masked assailants, one of whom was later identified as Newsome.  Subsequently, Newsome entered a plea of not guilty to the sole count in the indictment.

{¶3} On December 19 and 20, 2011, the matter proceeded to a jury trial.  After two hours of deliberation, the jury returned a verdict finding Newsome guilty of robbery.

**{¶4}** On December 23, 2011, the matter proceeded to sentencing, during which the trial court sentenced Newsome to an eight-year prison term.

**{¶5}** It is from this judgment Newsome appeals, raising the following assignments of error for our review.

### Assignment of Error No. I

**THE JURY ERRED BY FINDING APPELLANT GUILTY AS THE VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

### Assignment of Error No. II

**THE TRIAL COURT ERRED TO THE PREJUDICE OF THE APPELLANT WHEN IT REFUSED TO EXCLUDE HEARSAY EVIDENCE.**

### Assignment of Error No. III

**THE TRIAL COURT ERRED WHEN IT ADMITTED HEARSAY EVIDENCE INADMISSIBLE UNDER THE RULE IN _BRUTON V. UNITED STATES_.**

### Assignment of Error No. IV

**THE TRIAL COURT ERRED IN ADMITTING THE ALLEGED CHAFFINS (sic) STATEMENTS AS "STATEMENTS AGAINST INTEREST."**

### Assignment of Error No. V

**THE TRIAL COURT ERRED BY ADMITTING HEARSAY STATEMENTS OF ALLEGED CO-CONSPIRATOR CHAFFINS.**

*Assignment of Error No. VI*

**THE APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL IN VIOLATION OF THE APPELLANT'S CONSTITUTIONAL RIGHTS THEREBY DENYING HIM A FAIR TRIAL.**

*Assignment of Error No. VII*

**TRIAL COUNSEL ERRED IN NOT CHALLENGING JUROR OR REMOVING THE JUROR FOR CAUSE.**

*Assignment of Error No. VIII*

**THE TRIAL COURT ERRED BY SENTENCING APPELLANT TO THE MAXIMUM TERM OF IMPRISONMENT.**

*Assignment of Error No. IX*

**THE TRIAL COURT DID NOT PROPERLY INFORM THE APPELLANT OF THE CONSEQUENCES OF VIOLATING POST RELEASE CONTROL.**

*Assignment of Error No. X*

**THE COMBINATION OF THE CUMULATIVE ERRORS ARE SUFFICIENT TO CALL INTO QUESTION THE VALIDITY OF THE VERDICT PREVENTING THE APPELLANT FROM OBTAINING A FAIR TRIAL.**

**{¶6}** Due to the nature of Newsome's assignments of error, we elect to address the assignments out of order and combine the assignments where appropriate.

*Assignment of Error No. I*

**{¶7}** In his first assignment of error, Newsome contends that his finding of guilt was against the manifest weight of evidence. We disagree.

**{¶8}** When an appellate court analyzes a conviction under the manifest weight standard it must review the entire record, weigh all of the evidence and all of the reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the fact finder clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380, 387, superseded by constitutional amendment on other grounds as stated by *State v. Smith*, 80 Ohio St.3d 89, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). Only in exceptional cases, where the evidence "weighs heavily against the conviction," should an appellate court overturn the trial court's judgment. *Id.*

**{¶9}** As previously mentioned, Newsome was convicted of robbery in violation of R.C. 2911.02(A)(2), which provides as follows:

> (A) No person, in attempting or committing a theft offense or in fleeing immediately after the attempt or offense, shall do any of the following:
>
> * * *

(2)  Inflict, attempt to inflict, or threaten to inflict physical harm on another[.]

Bearing these elements in mind, we turn to the evidence presented at trial.

{¶10} Anastasia Brooks ("Brooks") testified that Newsome, her boyfriend at the time, and John Matthew Chaffins ("Chaffins"), were residing in her apartment, located in Defiance, Ohio, during the week of September 9, 2011. During that week, Brooks overheard several conversations between Newsome and Chaffins.  At trial, the State questioned Brooks about what she overheard, resulting in the following colloquy:

Q:  During the course of the week, were you able to personally overhear conversations between Matt and the defendant?

A:  Yes.

Q:  Did those conversations involve a plan to rob a place?

A:  Yes.

* * *

Q:  When you overheard them talking, you overheard them discussing a plan to rob a location?

A:  Yes.

Q:  Did that include Mike's Carry Out?

A:  Yes.

Q:  Was that Plan A?

A: Yes.

Q: Do you recall Plan B being a plan to rob a different place if Plan A did not work out?

A: Yes. Trial Tr., p. 225-227.

{¶11} According to Brooks, Newsome and Chaffins were at her apartment on Friday, September 9, 2011, the day of the robbery (hereinafter "Friday"). Brooks testified that Newsome and Chaffins left her apartment together at 9:30 p.m. that same day dressed in all black, wearing black nylon dew rags, and carrying a gun and a red flashlight.

{¶12} Contrary to Brook's testimony, Kimberly Black ("Black"), who was also dating Newsome at the time, testified that she was with Newsome at his mother's, Tammy Wilder's ("Wilder"), residence on Friday. Though Black acknowledged that Newsome had gone over to Brooks' apartment on Friday during the day, she testified that he returned to his mother's residence at approximately 9:30 p.m. and remained there until the following morning.

{¶13} Nancy Dotson ("Dotson") and Dan Groff ("Groff") were working at Bob's Carryout in Continental, Ohio on Friday night. At approximately 11:00 p.m., two masked men wearing all black entered Bob's Carryout. One of the men demanded that Dotson open the register, while the other approached her wielding a tire iron. Dotson, being fearful, moved out from behind the counter so the men

could access the register. The masked men looted the register and fled with several hundred dollars in one, five, ten, and twenty dollar bills.

{¶14} Officer Kyle Stechschulte ("Officer Stechschulte") testified that he was the second officer to arrive on scene. Officer Stechschulte testified that his patrol dog Viking, a trained tracking dog, was with him the night of the robbery. Officer Stechschulte testified that Viking picked up a scent that took him from Bob's Carryout over nearby railroad tracks and into a residential yard located at 202 North Elm Street.

{¶15} Meanwhile, on Friday night, Jeff Weible ("Jeff"), was at his residence with his wife Amanda Weible ("Amanda") and Black. Jeff testified that he was acquainted with Newsome and Black via Wilder, their neighbor. According to Jeff, he and Black were watching television at his residence on Friday night. Jeff testified that he fell asleep in his living room around 11:00 p.m. that night, and, at approximately midnight, was awoken by Newsome and Chaffins walking into the living room. According to Jeff, Black and Newsome went over to Wilder's residence and Chaffins fell asleep on his couch.

{¶16} On the morning of Saturday, September 10, 2011 (hereinafter "Saturday"), Amanda awoke to find Chaffins sleeping on her couch. Chaffins offered to buy Amanda breakfast and she agreed. Amanda testified that she thought Chaffins' offer was strange because he said he had no money on Friday.

{¶17} Meanwhile, on Saturday morning, Don Harter ("Harter"), who resides at 202 North Elm Street, found a red flashlight and a tire iron while mowing his lawn. Harter, who was aware that Bob's Carryout had been robbed the previous night, testified that he informed the Continental Police Department about the items.

{¶18} Chief Arnie Hardy ("Chief Hardy"), chief of the Continental Police Department, responded to Harter's residence to investigate the items. Chief Hardy documented the items and collected them as evidence. Chief Hardy testified that he showed Dotson and Groff the tire iron found in Harter's yard and each identified it as being similar to the tire iron used during the robbery. Chief Hardy later sent the red flashlight and tire iron to the Ohio Bureau of Criminal Identification & Investigation ("BCI") for fingerprint analysis. BCI, however, was unable to obtain any usable fingerprints from the items.

{¶19} Brooks testified that she saw Chaffins and spoke with Newsome on Saturday. Brooks testified that Chaffins indicated that "Plan A" did not work. Trial Tr., p. 230. As for Newsome, Brooks testified that he called her in the afternoon and asked her to move a gun. Brooks testified that she and another woman, Cassandra Robinson ("Robinson"), followed Newsome's directions and located the gun, as well as a dew rag. Brooks testified that neither she nor

Robinson touched the gun or dew rag, but that Robinson did report the items to the Defiance Police Department.

**{¶20}** At trial, Brooks identified both the red flashlight found in Harter's yard and the gun she found near her apartment as the items she saw Newsome and Chaffins with on the night of the robbery.

**{¶21}** Shortly after their discovery, Chief Hardy received the gun and dew rag from the Defiance Police Department. Chief Hardy testified that he showed the dew rag to Dotson and that she identified it as being similar to the ones worn by the assailants. Soon after receiving the dew rag and gun, Chief Hardy received several black clothes and another dew rag found in a corn field near Wilder's residence. Chief Hardy testified that one article of clothing found in the field, a black t-shirt with white graphics, was similar to a black t-shirt worn by Newsome in a picture Brooks took on September 8, 2011, the day before the robbery. After collecting the dew rags, Chief Hardy sent them to BCI for DNA analysis.

**{¶22}** Lynda Eveleth ("Eveleth"), a forensic DNA analyst with BCI, testified that she conducted DNA testing of both dew rags. Eveleth testified that the DNA sample taken from the dew rag found near Newsome's mother's residence matched Chaffins' DNA sample. As for the dew rag found near Brooks' apartment, Eveleth testified that Newsome could not be excluded as a contributor of the DNA found in the dew rag.

{¶23} Alex Recker ("Recker"), who was incarcerated in the same jail as Chaffins and Newsome during the pendency of the instant case, testified that Chaffins admitted to robbing a carryout with Newsome. At trial, the State questioned Recker about the specifics of Chaffins' statements, resulting in the following colloquy:

> Q: Did you have discussions then with John Matthew Chaffins regarding his involvement on the robbery on September 9, 2011?
>
> A: Yes.
>
> Q: And did those discussions also include the involvement of Mr. Newsome?
>
> A: Yes.
>
> * * *
>
> Q: And can you describe what Chaffins told you in terms of the circumstances surrounding that robbery of Bob's carry out?
>
> * * *
>
> A: They first started out at an apartment in Defiance. They started off that I guess they were going to rob a different store, but that didn't work out, so this was a fallback plan. And so they went to Continental instead and came in through the back of the drive-thru, and then I guess [Newsome] went in first; and then they got the money and they went out the front of the store and ran over the railroad tracks and then out of town that way.
>
> * * *
>
> Q: Did Chaffins discuss with you the ditching of any clothing?

-11-

* * *

A: They said they got paranoid - -

* * *

A:  - - on the way back, so they pulled off and they took off their black clothes and threw it in a field.

Q: Did Chaffins make any statement about whether or not there was any sort of item that they, weapon that they possessed when entering Bob's Carry Out?

A: They said they used a tire iron.  Trial Tr., p. 289-291.

Recker testified that when he asked Newsome about the robbery, Newsome would not admit his involvement.

{¶24} Upon considering the foregoing evidence, we find that Newsome's conviction for robbery was not against the manifest weight of the evidence. Brooks' testimony demonstrates that Newsome and Chaffins were planning to rob a carryout.  Brooks' and Jeffery's testimony, when viewed together, demonstrates that Newsome and Chaffins were together on the night of the robbery and their whereabouts unknown at the time the robbery occurred.  Brooks' testimony also demonstrates that Newsome and Chaffins were dressed in all black and wearing dew rags, like the assailants that robbed Bob's Carryout, an hour and a half before the robbery occurred.  The red flashlight discovered in Harter's yard, which Brooks identified as the flashlight Newsome and Chaffins possessed on the night

-12-

of the robbery, demonstrates that Newsome and Chaffins were near Bob's Carryout on the night of the robbery. DNA testing of the dew rag, which was found near a gun that Newsome asked Brooks to retrieve and was identified by Dotson as similar to the dew rags worn by the assailants, demonstrates that Newsome was one of the assailants. Finally, Recker's testimony concerning Chaffins' description of the events preceding the robbery, the robbery itself, and the events following the robbery corroborate the overwhelming circumstantial evidence which, in and of itself, supports the jury's determination that Newsome robbed Bob's Carryout.

{¶25} Accordingly, we overrule Newsome's first assignment of error.

*Assignments of Error Nos. II, III, IV & V*

{¶26} In his second, third, fourth, and fifth assignments of error, Newsome contends that the trial court erred when it refused to exclude Recker's testimony describing Chaffins' statements. In particular, Newsome argues that Recker's testimony was (1) violative of the Confrontation Clause, (2) inadmissible under the rule announced in *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620 (1968), and (3) inadmissible hearsay. We disagree.

*The Confrontation Clause*

{¶27} The Sixth Amendment to the U.S. Constitution provides, in relevant part, that, "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to

be confronted with the witnesses against him." Specifically, the Confrontation Clause bars the "'admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination.'" *Davis v. Washington*, 547 U.S. 813, 821, 126 S.Ct. 2266 (2006), quoting *Crawford v. Washington*, 541 U.S. 36, 53-54, 124 S.Ct. 1354 (2004). Conversely, the Confrontation Clause does not bar the admission of nontestimonial out-of-court statements. *Whorton v. Bockting*, 549 U.S. 406, 420, 127 S.Ct. 1173 (2007). Accordingly, the threshold question in a case, such as this, where a violation of the Confrontation Clause is alleged "is whether the challenged statement is testimonial. If it is not, the Confrontation Clause 'has no application[.]'" *United States v. Figueroa-Cartagena*, 612 F.3d 69, 85 (1st Cir.2010), quoting *Whorton* at 420.

**{¶28}** Newsome contends that Chaffins' statements to Recker were testimonial, because the State presented no evidence establishing Recker's motive for testifying. Without such evidence, Newsome argues that Chaffins' statements were testimonial because they were made "in a setting that could have only lead to a government informant seeking to elicit the statements to further the prosecution against Chaffins or [Newsome.]" Appellant's Br., p. 11. We find Newsome's argument unavailing.

-14-

{¶29} Contrary to Newsome's argument, the State's failure to present evidence regarding Recker's motive to testify does not create a presumption that Recker was a government informant seeking to elicit statements for prosecution. First, Newsome cites no authority which supports such a presumption. Second, and more importantly, Newsome had the opportunity to cross-examine Recker concerning his motives for testifying and did not. Given these shortcomings, we find that the State's failure to present evidence regarding Recker's motive to testify does not create a presumption that Recker was a government informant seeking to elicit statements for purposes of prosecution.

{¶30} Chaffins' statements to Recker bear none of the characteristics of testimonial statements. The record reveals that Chaffins and Recker became familiar with each other because they were housed together in the jail's medical pod. During their time together, the men casually conversed about the offenses that lead to their incarceration. It was during these conversations that Chaffins freely described the robbery. Given these facts, we find that Chaffins' statements were not made under formal circumstances (such as police interrogation), but rather to a fellow inmate, under circumstances that did not portend their use at trial against Newsome or Chaffins. *See Crawford*, 541 U.S. at 51, 124 S.Ct. 1354 ("An accuser who makes a formal statement to government officers bears testimony in a

Case No. 12-12-03

sense that a person who makes a casual remark to an acquaintance does not."). As such, we find Chaffins' statements to Recker were nontestimonial.

{¶31} Our finding is consistent with other courts, which have found inmate conversations similar to those between Recker and Chaffins to be nontestimonial. *Dutton v. Evans*, 400 U.S. 74, 87-89, 91 S.Ct. 210 (1970) (plurality opinion, Stewart, J.) (determining that Confrontation Clause did not bar statements from one inmate to another)[1]; *United States v. Pelletier*, 666 F.3d 1, 9-10 (1st Cir.2011) (determined that statements from one inmate to another were nontestimonial); *U.S. v. Smith*, 383 Fed.Appx. 355, 357 (4th Cir.2010) (same); *United States v. Johnson*, 495 F.3d 951, 976 (8th Cir.2007) (same); *United States v. Johnson*, 192 Fed.Appx. 935, 938 (11th Cir.2006) (same); *see also United States v. Smalls*, 605 F.3d 765, 778 (10th Cir.2010) (finding statement made to confidential informant nontestimonial where declarant knew informant only as an inmate); *United States v. Johnson*, 581 F.3d 320, 325 (6th Cir.2009) (same).

{¶32} Given the foregoing, we find that Chaffins' statements to Recker were nontestimonial, and consequently find that their admission was not barred by the Confrontation Clause.

---

[1] While the *Dutton* decision was decided before *Crawford*, the Supreme Court recognized that the statements at issue in *Dutton* were nontestimonial. *Davis* at 825.

-16-

*Bruton v. United States*

**{¶33}** Contrary to Newsome's assertion, the rule announced in *Bruton v. United States* is inapplicable. In *Bruton*, the Supreme Court held that introducing an out-of-court confession by a non-testifying defendant violated the Confrontation Clause rights of a co-defendant who was incriminated by the statement. *Bruton*, 391 U.S. at 137, 88 S.Ct. 1620. Because it is premised on the Confrontation Clause, the *Bruton* rule, like the Confrontation Clause, does not apply to nontestimonial statements. *E.g.*, *Johnson*, 581 F.3d at 326. Accordingly, since Chaffins' statements to Recker were nontestimonial their admission does not offend the rule announced in *Bruton*.

*Hearsay*

**{¶34}** While Chaffins' statements to Recker are not violative of the Confrontation Clause or the rule announced in *Bruton*, their admission was still subject to the Rules of Evidence. Here, Newsome contends that Recker's testimony describing Chaffins' statements was inadmissible hearsay. While we agree that Recker's testimony describing Chaffins' statements was hearsay, we find that the trial court properly admitted Recker's testimony as a statement against interest.

{¶35} Hearsay evidence is not admissible "unless subject to a relevant exception."[2] *State v. Steffen*, 31 Ohio St.3d 111, 119 (1987), citing Evid.R. 802. During trial, the trial court determined that Chaffins' statements to Recker were admissible as statements against interest. Evid.R. 804(B)(3) provides an exception for statements against interest when the declarant is unavailable to testify as a witness, and provides, in relevant part, as follows:

> (3) *Statement against interest*. A statement that was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless the declarant believed it to be true. A statement tending to expose the declarant to criminal liability, whether offered to exculpate or inculpate the accused, is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement

{¶36} For Chaffins' statements to qualify under the statement against interest exception, the State must have established that (1) Chaffins was unavailable as a witness, (2) the statements were against Chaffins' interest and tended to subject him to criminal liability, and (3) corroborating circumstances indicate the trustworthiness of the statements. Evid.R. 804(B)(3). All three elements must be present in order for the statements to be admissible under

---

[2] Though the hearsay exceptions contained within the Rules of Evidence are often the means by which hearsay is rendered admissible, we note, for purposes of completeness, that hearsay is also admissible as provided by the "Constitution of the United States, by the Constitution of the State of Ohio, by statute enacted by the General Assembly not in conflict with a rule of the Supreme Court of Ohio, * * *, or by other rules prescribed by the Supreme Court of Ohio." Evid.R. 802.

Evid.R. 804(B)(3). *See, e.g.*, *State v. Gilliam*, 70 Ohio St.3d 17, 20 (1994), overruled on other grounds by *State v. Madrigal*, 87 Ohio St.3d 378 (2000). Admission of a hearsay statement pursuant to Evid.R. 804(B)(3) is within the sound discretion of the trial court, and will not be disturbed absent an abuse of that discretion. *State v. Sumlin*, 69 Ohio St.3d 105, 108 (1994), citing *State v. Landrum*, 53 Ohio St.3d 107, 114 (1990).

{¶37} Both parties agree that the first two elements have been established. As for the first element, a declarant who invokes their right against self-incrimination is considered unavailable for purposes of the unavailability requirement of Evid.R. 804. *Sumlin* at 108; *Landrum* at 113. Here, the State called Chaffins' to the stand, where he asserted his right against self-incrimination. Accordingly, Chaffins was unavailable. As for the second element, Chaffins' statements that he robbed Bob's Carryout with Newsome clearly expose him to criminal liability.

{¶38} Newsome, however, contends that there were insufficient corroborating circumstances indicating the trustworthiness of Chaffins' statements. We disagree. Recker and Chaffins' relationship, which can best be described as a friendship, is a circumstance indicating trustworthiness. *State v. Yarbrough*, 95 Ohio St.3d 227, 236 (2002) ("[W]here a declarant makes a statement to someone with whom he has a close personal relationship, such as a *

-19-

* * friend, courts usually hold that the relationship is a corroborating circumstance *supporting* the statement's trustworthiness."), citing *Green v. Georgia*, 442 U.S. 95, 97, 99 S.Ct. 2150 (1979). Also, the fact that Chaffins' description of the robbery did not shift blame solely onto Newsome, or minimize his participation in the robbery, is a circumstance indicating trustworthiness. *See State v. Issa*, 93 Ohio St.3d 49, 61 (2001).

**{¶39}** Given the foregoing, as well as the lack of any evidence that Recker was working as a government informant or was receiving something in exchange for his testimony, we find that the trial court did not abuse its discretion when it determined that Chaffins' statements were trustworthy and consequently admissible under the statements against interest hearsay exception.[3]

*Harmless Error*

**{¶40}** Assuming arguendo Recker's testimony describing Chaffins' statements was inadmissible, admission of Recker's testimony would be harmless error in light of the overwhelming circumstantial evidence implicating Newsome in the robbery.

**{¶41}** In sum, we find that admission of Recker's testimony describing Chaffins' statements about the robbery was not violative of the Confrontation

---

[3] In addition to arguing that Chaffins' statements are not admissible as statements against interest, Newsome also argues that Chaffins' statements do not qualify as statements of a co-conspirator, under Evid.R. 801(D)(2)(e). We need not reach this argument, however, since we have determined that Chaffins' statements are admissible as statements against interest.

Clause, the rule announced in *Bruton*, and was admissible pursuant to the statement against interest hearsay exception. Moreover, even if Recker's testimony was inadmissible its admission would be harmless error in light of the other evidence presented at trial.

{¶42} Accordingly, we overrule Newsome's second, third, fourth, and fifth assignments or error.

*Assignments of Error Nos. VI & VII*

{¶43} In his sixth and seventh assignments of error, Newsome contends that he was denied effective assistance of counsel. As to his sixth assignment of error, Newsome argues that trial counsel should have filed a motion to suppress statements he made to law enforcement. As to his seventh assignment of error, Newsome argues that counsel should have challenged the empanelment of one of the jurors during voir dire. We disagree with both contentions.

{¶44} An ineffective assistance of counsel claim requires proof that trial counsel's performance fell below objective standards of reasonable representation and that the defendant was prejudiced as a result. *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph two of syllabus. To show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, but for counsel's errors, the outcome at trial would have been different. *Id*. at paragraph three of syllabus. "Reasonable

probability" is a probability sufficient to undermine confidence in the outcome of the trial. *State v. Waddy*, 63 Ohio St.3d 424, 433 (1992), superseded by constitutional amendment on other grounds as recognized by *Smith*, 80 Ohio St.3d at 103.

{¶45} Furthermore, the court must look to the totality of the circumstances and not isolated instances of an allegedly deficient performance. *State v. Malone*, 2d Dist. No. 10564 (Dec. 13, 1989). "Ineffective assistance does not exist merely because counsel failed 'to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it.'" *Id.*, quoting *Smith v. Murray*, 477 U.S. 527, 535, 106 S.Ct. 2661 (1986).

*Motion to Suppress*

{¶46} "[F]ailure to file a suppression motion does not constitute per se ineffective assistance of counsel." *Madrigal*, 87 Ohio St.3d at 389, quoting *Kimmelman v. Morrison*, 477 U.S. 365, 384, 106 S.Ct. 2574 (1986). There must also be a reasonable probability that the motion will be successful. *State v. Ligon*, 3d Dist. No. 4-2000-25, (June 18, 2001). Thus, this court's determination of whether Newsome's trial counsel was ineffective relies upon whether there was a reasonable probability that a motion to suppress would have been successful. *State v. Pierce*, 3d Dist. No. 11-09-05, 2010-Ohio-478, ¶ 34.

{¶47} Newsome argues that trial counsel should have filed a motion to suppress statements he made to law enforcement. Several days after the robbery occurred, Chief Hardy interviewed Newsome at the Putnam County Sheriff's Office.[4] The interview was recorded ("the recording") and segments of the interview were played during trial. Newsome argues that he was neither informed of nor waived his *Miranda* rights prior to interview.[5] Newsome bases his argument on the fact that none of the interview segments played during trial contained a *Miranda* warning. As a result, Newsome argues that there was a reasonable probability that a motion to suppress would have been successful had it been filed with the trial court. We find Newsome's argument unavailing.

{¶48} The mere fact that none of the interview segments played at trial contained a *Miranda* warning does not, as Newsome argues, establish that Chief Hardy failed to administer *Miranda* warnings. The record reveals that the State forwarded the recording to Newsome's trial counsel. (Docket No. 17, p. 2). Attorneys licensed by the State of Ohio are presumed to provide competent representation, thus we must afford a high level of deference to the performance of trial counsel. *State v. Plotts*, 3d Dist. No. 15-10-08, 2011-Ohio-900, ¶ 37. Given

---

[4] We note that Newsome was in custody at the time of the interview.

[5] Although the record contains the interview recording in its entirety, the recording was not admitted into evidence. Therefore, we are not permitted to consider those portions of the recording not presented at trial, and thus cannot independently determine whether Chief Hardy administered *Miranda* warnings to Newsome.

this presumption, we must presume that Newsome's counsel reviewed the recording. Without evidence to the contrary, we can only surmise that the recording captured Chief Hardy administering *Miranda* warnings to Newsome. If this were not the case, we would expect, and the law presumes, that Newsome's counsel would have filed a motion to suppress the interview. Consequently, we find that Newsome has failed to demonstrate that there was a reasonable probability that a motion to suppress would have been successful.

*Juror Challenge*

{¶49} Newsome contends that he was denied effective assistance of counsel because counsel did not challenge Juror Dalton Yenser ("Juror Yenser") for cause. Specifically, Newsome argues that counsel should have challenged Juror Yenser for cause because he was acquainted with Newsome and had knowledge of the robbery. We disagree.

{¶50} The decision whether to challenge a juror for cause is a trial tactic. *See State v. Hill*, 3d Dist. No. 11-03-07, 2003-Ohio-5123, ¶ 30. Debatable trial tactics, without more, will not be grounds for a claim of ineffective assistance. *Id.*, citing *State v. Clayton*, 62 Ohio St.2d 45, 49 (1980). In particular, when jurors demonstrate during voir dire that they are able to remain fair and impartial, no action will lie for ineffective assistance of counsel for not seeking their removal. *State v. Bofia*, 3d Dist. No. 7-03-12, 2004-Ohio-3018, ¶ 14, citing *Hill* at ¶ 29.

-24-

{¶51} During voir dire, the trial court asked the prospective jurors whether they had any knowledge or information concerning the robbery of Bob's Carryout. Several jurors responded in the affirmative, including Juror Yenser. The trial court questioned Juror Yenser about his knowledge of the robbery, resulting in the following colloquy:

> Juror Yenser: I was actually right down the road when it happened. I didn't see anything; but I was - - we came back from the racetrack, and I was told that it just happened.
>
> The Court: All right. Do you know any of the individuals involved in these allegations?
>
> Juror Jenser: Just the people that called it in. I didn't really know anything else about it.
>
> The Court: Do you feel that you could put out of you mind any information that you would have and judge this case solely from what you would see and hear in the courtroom?
>
> Juror Yenser: Yes. Trial Tr., p. 15.

{¶52} The trial court also asked the prospective jurors whether they knew Newsome, to which Juror Yenser responded in the affirmative. The trial court questioned Juror Yenser about his acquaintance with Newsome, resulting in the following colloquy:

> Juror Yenser: [Newsome] used to be a close friend of my cousin's.
>
> The Court: All right. Did you have any contact with Mr. Newsome?
>
> Juror Yenser: Yes.

The Court:  In the past did you have contact with him?

Juror Yenser:  Yes, he used to be my neighbor at one point in time.

The Court:  All right.  And your instruction would be to judge this case solely from what you would see and hear from the witness stand and that you be a fair and impartial juror to both sides. Knowing that the defendant in this case is Joshua Newsome, do you feel that you could be a fair and impartial juror?

Juror Yenser:  Yeah.

The Court:  Do you feel you could put out of you mind those past contacts that you may have had with him?

Juror Yenser:  Yes.

The Court:  When was the last contact you had with him?

{¶53} Juror Yenser:  Three or four years ago probably.

The Court:  All right.  Do you feel comfortable in being a juror, knowing that you have some past contact?

Juror Yenser:  Yeah.  Trial Tr., p. 17-18.

In addition to the foregoing colloquy, the State and Newsome's counsel also questioned Juror Yenser about his prior contacts with Newsome and whether he could remain fair and impartial in light of his acquaintance with Newsome.  In each instance, Juror Yenser testified that his acquaintance with Newsome would not affect his ability to be impartial and fair.

**{¶54}** Though Juror Yenser was both aware of the robbery and familiar with Newsome, we find, given his responses during voir dire, that he was capable of being a fair and impartial juror. Juror Yenser knew little about the robbery beyond the fact that it occurred and he knew the people who reported the robbery to law enforcement. Given the paucity of Juror Yenser's knowledge about the robbery, there was no reason for Newsome's counsel to doubt Juror Yenser when he testified that he was capable of setting his knowledge of the robbery aside and remain fair and impartial.

**{¶55}** Similarly, Juror Yenser testified that his acquaintance with Newsome would not affect his ability to be fair and impartial. During voir dire, Juror Yenser testified that he and Newsome were neighbors approximately ten years prior. Juror Yenser also testified that, through his cousin, he had contact with Newsome, but that he had not seen Newsome in four years. At best, Juror Yenser's acquaintance with Newsome was distant and casual, not close and ongoing. Given the nature of Juror Yenser's acquaintance with Newsome, there was no reason for Newsome's counsel to doubt Juror Yenser when he testified that his acquaintance with Newsome would not affect his ability to be fair and impartial. *See State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, ¶ 208, citing *Miller v. Francis*, 269 F.3d 609, 618 (6th Cir.2001).

**{¶56}** Based on Juror Yenser's testimony, we find that he was able to demonstrate that he could remain fair and impartial. Accordingly, counsel's failure to challenge Juror Yenser for cause did not deny Newsome effective assistance of counsel. *Bofia*, 2004-Ohio-3018, at ¶ 14.

**{¶57}** Accordingly, we overrule Newsome's sixth and seventh assignments of error.

### *Assignment of Error No. X*

**{¶58}** In his tenth assignment of error, Newsome contends that the combined effect of all the errors in this case denied him a right to a fair trial. We disagree.

**{¶59}** Pursuant to the cumulative error doctrine, a conviction will be reversed where the cumulative effect of the errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of the errors in and of themselves are not cause for reversal. *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, ¶ 223, citing *State v. DeMarco*, 31 Ohio St.3d 191 (1987), paragraph two of the syllabus. Since we have found no errors, the doctrine of cumulative error is not applicable in the instant case.

**{¶60}** Accordingly, we overrule Newsome's tenth assignment of error.

*Assignment of Error No. VIII*

**{¶61}** In his eighth assignment of error, Newsome contends that the trial court erred when it sentenced him to the maximum sentence. We disagree.

**{¶62}** "A trial court's sentence will not be disturbed on appeal absent a defendant's showing by clear and convincing evidence that the sentence is unsupported by the record or otherwise contrary to law." *State v. Barrera*, 3d Dist. No. 12-12-01, 2012-Ohio-3196, ¶ 20, citing R.C. 2953.08(G)(2). Clear and convincing evidence is that "which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus. An appellate court should not, however, substitute its judgment for that of the trial court because the trial court is "'clearly in the better position to judge the defendant's likelihood of recidivism and to ascertain the effect of the crimes on the victims.'" *State v. Watkins*, 3d Dist. No. 2-04-08, 2004-Ohio-4809, ¶ 16.

**{¶63}** R.C. Chapter 2929 governs sentencing. When sentencing a felony offender, the trial court must consider R.C. 2929.11, which sets forth the overriding purposes of felony sentencing, providing, in relevant part, as follows:

> (A) A court that sentences an offender for a felony shall be guided by the overriding purposes of felony sentencing. The overriding purposes of felony sentencing are to protect the public from future crime by the offender and others and to punish the offender using the minimum sanctions that the court determines accomplish those

purposes without imposing an unnecessary burden on state or local government resources. To achieve those purposes, the sentencing court shall consider the need for incapacitating the offender, deterring the offender and others from future crime, rehabilitating the offender, and making restitution to the victim of the offense, the public, or both.

(B) A sentence imposed for a felony shall be reasonably calculated to achieve the two overriding purposes of felony sentencing set forth in division (A) of this section, commensurate with and not demeaning to the seriousness of the offender's conduct and its impact upon the victim, and consistent with sentences imposed for similar crimes committed by similar offenders.

{¶64} The trial court must also consider the factors set forth under R.C. 2929.12(B), (C), (D), and (E) relating to the seriousness of the offender's conduct and the likelihood of the offender's recidivism, and "may consider any other factors that are relevant to achieving those purposes and principles of sentencing." *State v. Hartley*, 3d Dist. No. 14-11-29, 2012-Ohio-4108, ¶ 31; R.C. 2929.12(A).

{¶65} Newsome argues that the trial court erred in imposing the maximum sentence because it commented on charges pending against him in unrelated cases and the fact that he could have been charged with aggravated robbery, a felony of the first degree. We find Newsome's argument unavailing.

{¶66} There is no evidence that the comments described above prejudicially affected the trial court's sentencing decision. As for the pending charges, the trial court explicitly stated that the pending charges did not factor into its sentencing decision. As for the possibility of being charged with a first degree

felony, we fail to see how this comment prejudicially affected the trial court's sentencing decision. If anything, mention of this possibility simply highlighted the serious nature of the offense, which is to be considered when sentencing a felony offender. *See* R.C. 2929.12(B).

{¶67} Notwithstanding the comments Newsome complains of on appeal, Newsome points to nothing that clearly and convincingly demonstrates that the record does not support the trial court's imposition of the maximum sentence. During the sentencing hearing, the trial court "considered the record, oral statements, Defendant's prior pre-sentence investigation report, and any victim impact statements, as well as the principles and purposes of sentencing under Ohio Revised Code Section 2929.11 & 2929.12." Judgment Entry of Sentencing, p. 1. Our independent review of these materials, particularly the pre-sentence investigation report ("PSI"), reveals that Newsome's sentence is supported by the record.

{¶68} According to the PSI, Newsome, who was 24 years old at the time of sentencing, had an extensive criminal history dating back to 1999. During the sentencing hearing, the trial court addressed Newsome's criminal history which included offenses committed while he was a juvenile and an adult. These offenses included, but are not limited to, theft, attempted theft, domestic violence, criminal damaging, probation violation, failure to comply with an order of a police officer,

disorderly conduct, obstructing official business, attempted grand theft of a motor vehicle, and contributing to the delinquency of a minor. In light of Newsome's extensive criminal history and the violent nature of the robbery at issue in the instant case, we find that the trial court's decision to sentence Newsome to the maximum sentence is supported by the record.

{¶69} Accordingly, we overrule Newsome's eighth assignment of error.

*Assignment of Error No. IX*

{¶70} In his ninth assignment of error, Newsome contends that the trial court did not properly inform him of the consequences for violating post-release control. Specifically, Newsome argues that pursuant to R.C. 2967.28(F)(3) the trial court was required to, and failed to, inform him "about the possibility of a sentence up to nine months as [a] post-release control sanction." Appellant's Br., p. 22. We disagree.

{¶71} R.C. 2929.19 governs the trial court's duty to conduct a sentencing hearing. In an earlier version of R.C. 2929.19, the trial court was required to notify a felony offender about the possibility that he or she could be sentenced to a nine-month prison term if he or she violated the terms of their post-release control. However, this requirement was removed via amendments to R.C. 2929.19 that took effect on March 23, 2000. Am.Sub.S.B. No. 107 (1999).

{¶72} At the time of Newsome's sentencing, R.C. 2929.19(B) provided, in relevant part, as follows:

(2) * * * if the sentencing court determines at the sentencing hearing that a prison term is necessary or required, the court shall do all of the following:

* * *

(c) Notify the offender that the offender will be supervised under section 2967.28 of the Revised Code after the offender leaves prison if the offender is being sentenced for a felony of the * * * second degree[.]

* * *

(e) Notify the offender that, if a period of supervision is imposed following the offender's release from prison, as described in division (B)(2)(c) or (d) of this section, and if the offender violates that supervision or a condition of post-release control imposed under division (B) of section 2967.131 of the Revised Code, the parole board may impose a prison term, as part of the sentence, of up to one-half of the stated prison term originally imposed upon the offender.

Notably, the foregoing language does not require the trial court to notify a felony offender that he or she may be sentenced to a nine-month prison term if he or she violates the terms of their post-release control. Instead, R.C. 2929.19(B), simply requires the trial court to notify the felony offender of two things about post-release control, to wit: (1) the offender will be supervised under R.C. 2967.28, which governs post-release control, after they leave prison; and (2) if the offender violates post-release control they are subject to an additional period of

incarceration of up to one-half of the stated prison term originally imposed upon them.[6] R.C. 2929.19(B)(2)(c), (e).

{¶73} Given the legislative history of R.C. 2929.19 and its plain language, we find that the trial court was not required to notify Newsome of the possibility that he could be sentenced to a nine-month prison term if he violated the terms of his post-release control. *State v. Zganjer*, 8th Dist. No. 94724, 2011-Ohio-606.

{¶74} During the sentencing hearing, the trial court advised Newsome that he was subject to mandatory post-release control for 3 years and that violating the terms of his post-release control could result in the imposition of a prison term of up to one-half his original sentence, or four years. We find that the trial court's advisements concerning post-release control were both proper and sufficient to satisfy R.C. 2929.19(B). Therefore, we find Newsome's argument unavailing.

{¶75} Accordingly, we overrule Newsome's ninth assignment of error.

{¶76} Having found no error prejudicial to Newsome herein, in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**PRESTON and WILLAMOWSKI, J.J., concur.**

---

[6] In addition to these requirements, this court and others have recognized that the trial court must also notify the defendant of whether post-release control is mandatory or discretionary and the duration of post-release control. *State v. Holdcroft*, 3d Dist. No. 16-10-13, 2012-Ohio-3066, ¶ 29, citing *State v. Fischer*, 128 Ohio St.3d 92, 2010-Ohio-6238, ¶ 27-29.