[Cite as *State v. Tyus*, 2020-Ohio-4455.]

STATE OF OHIO            )                IN THE COURT OF APPEALS
                         )ss:             NINTH JUDICIAL DISTRICT
COUNTY OF SUMMIT         )

STATE OF OHIO                             C.A. No.      29520

    Appellee

    v.                                    APPEAL FROM JUDGMENT
                                          ENTERED IN THE
ORLANDO PEDRO TYUS                        COURT OF COMMON PLEAS
                                          COUNTY OF SUMMIT, OHIO
    Appellant                             CASE No.      CR-2018-09-3067(A)

DECISION AND JOURNAL ENTRY

Dated: September 16, 2020

CALLAHAN, Presiding Judge.

**{¶1}** Appellant, Orlando Tyus, appeals his convictions in the Summit County Court of Common Pleas.

I.

**{¶2}** At 3:39 a.m. on July 7, 2018, Akron police officers were dispatched in response to a 911 call reporting a shooting on Schiller Avenue on the north side of Akron. When they arrived, they discovered the body of B.R., who appeared to have been shot in the back of the head. B.R.'s brother, C.R., reported that two individuals had approached them from behind as they neared their parked car. One brandished a gun and demanded money from C.R., who then heard several gunshots as B.R. was shot by the other individual. C.R. fled on foot, then called 911. Police recovered three spent shell casings and one live round from the scene. Officers detained three men who were in the area near the time of the shooting—including one man who stopped to render aid to B.R.—but they determined that those individuals were not involved.

{¶3}    Later that morning, at approximately 5:51 a.m., another individual placed a 911 call to report the discovery of a shooting victim in the area of 5th Avenue and Arlington Street on the south side of Akron.  When the caller met with officers at her location, she led them to a parking lot where she had found the body of a man she identified as "Shorty," a homeless individual who did odd jobs in the neighborhood.  "Shorty," later identified as R.M., had suffered a gunshot wound to the head.

{¶4}    When officers canvassed the area where R.M.'s body was discovered, they encountered a woman named C.H.  C.H. reported that earlier that morning, she had been lured into an alley known as Minordy Place at its intersection with 6th Avenue by an individual who led her to believe that he had drugs for her.  She informed the officers that once in the alley, a woman aimed a gun at her head.  A man then did the same, but when he pulled the trigger, the gun did not fire.  C.H. told the officers that she managed to flee, and she took them to the location of the incident, where they recovered two live rounds of ammunition.

{¶5}    The three incidents did not appear to be connected, and police did not obtain information leading to any suspects until mid-August.  At that time, a woman who had been taken into custody on drug charges and who was being recruited to serve as a confidential informant disclosed that she had information about a homicide.  The woman, B.H., informed police that a younger acquaintance, C.J., had disclosed to her that she had participated in a series of shootings that occurred the weekend after the Fourth of July holiday.  B.H. identified the two men who also participated in the shootings as "Bishop" and "Orka," who she described as half-brothers.  B.H. told officers that she had originally heard that two men and one woman had been killed, but she later learned that the woman had escaped because a gun malfunctioned.  As a result of their interview with B.H., the investigators obtained the names of Donyea Tyus, known as "Bishop,"

and Orlando Tyus, known as "Orka." They also interviewed C.J., who was in custody after a drug-related arrest at the time.

{¶6} Orlando Tyus and his brother, Donyea Tyus, were each charged with two counts of aggravated murder in violation of R.C. 2903.01(A), two counts of murder in violation of R.C. 2903.02(A), two counts of felonious assault in violation of R.C. 2903.11(A)(2), and one count of having a weapon while under disability in violation of R.C. 2923.13(A)(2). The aggravated murder and murder charges were accompanied by firearm specifications pursuant to R.C. 2941.145(A). Prior to trial, Orlando moved to sever their trials. The trial court denied the motion, and Orlando and Donyea were tried together to a jury. The jury found Orlando guilty of each charge. After merging the murder counts and related firearm specifications into the aggravated murder counts and related specifications, the trial court sentenced Orlando to life in prison without the possibility of parole as punishment for each count of aggravated murder. The trial court also sentenced Orlando to consecutive prison terms for each gun specification and each of the remaining counts.

{¶7} Orlando appealed, raising six assignments of error. Several of his assignments of error are rearranged for purposes of discussion.

II.

**ASSIGNMENT OF ERROR NO. 1**

THE TRIAL COURT ERRED BY DENYING ORLANDO TYUS' MOTION TO SEVER HIS TRIAL, IN VIOLATION OF THE 5TH, 6TH, AND 14TH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ART. 1, § 10, OF THE OHIO CONSTITUTION.

{¶8} In his first assignment of error, Orlando Tyus argues that the trial court erred by denying his motion to sever his trial from that of his brother because one of the State's witnesses testified with respect to out-of-court statements made by Donyea. This Court does not agree.

{¶9} Crim.R. 8(B), which permits joinder of multiple defendants, provides that "[t]wo or more defendants may be charged in the same indictment * * * if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses, or in the same course of criminal conduct." The law favors joinder because it promotes the conservation of judicial resources and mitigates the possibility of inconsistent results. *State v. Boone*, 10th Dist. Franklin No. 14AP–87, 2015-Ohio-2648, ¶ 25. Nevertheless, when it appears that joinder of multiple defendants for trial prejudices a defendant, a trial court must sever the defendants and conduct separate trials. *See* Crim.R. 14.

{¶10} The Sixth Amendment to the United States Constitution guarantees an accused the right to confront witnesses against him. *Crawford v. Washington*, 541 U.S. 36, 54 (2004). The Confrontation Clause is implicated by the admission of out-of-court statements that are testimonial in nature when the declarant does not testify in the proceeding. *See Melendez–Diaz v. Massachusetts*, 557 U.S. 305, 309–310 (2009). Only testimonial statements make a declarant a "witness" for purposes of the Confrontation Clause, and "[i]t is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause." *Davis v. Washington*, 547 U.S. 813, 821 (2006).

{¶11} In *Bruton v. U.S.*, 391 U.S. 123 (1968), the United States Supreme Court recognized that when multiple defendants are tried together, the admission of an out-of-court confession by a co-defendant that incriminates the defendant violates the Confrontation Clause, and the violation cannot be cured by means of a limiting instruction. *Id*. at 126, 137. The same constitutional infirmity may be present when the out-of-court statements were made to a prosecution witness other than a police officer. *See State v. Moritz*, 63 Ohio St.2d 150, 154 (1980). Similarly, an out-

of-court statement by a co-defendant may incriminate a defendant even if the defendant is not mentioned by name. *Id*. at 155, quoting *Fox v. State*, 384 N.E.2d 1159, 1170 (Ind.App.1979).

{¶12} Because *Bruton* violations are grounded in the Confrontation Clause, however, the out-of-court statements at issue must be testimonial for the protections of the Confrontation Clause to attach. *U.S. v. Johnson*, 581 F.3d 320, 326 (6th Cir.2009). "'*Bruton* is simply irrelevant in the context of nontestimonial statements * * * Statements that do not implicate the Confrontation Clause, a fortiori, do not implicate *Bruton*.'" (Alterations in original.) *State v. Luckie*, 5th Dist. Richland Nos. 16CA91, 16CA92, 16CA93, 2018-Ohio-594, ¶ 44, quoting *U.S. v. Dargan*, 738 F.3d 643, 651 (4th Cir.2013). *See also State v. Fannon*, 4th Dist. Athens Nos. 17CA24, 17CA26, 2018-Ohio-5242, ¶ 28-29; *State v. Carter*, 7th Dist. Mahoning No. 15 MA 0225, 2017-Ohio-7501, ¶ 39; *State v. Chaffin*, 2d Dist. Montgomery No. 25220, 2014-Ohio-2671, ¶ 41; *State v. Newsome*, 3d Dist. Putnam No. 12-12-03, 2012-Ohio-6119, ¶ 27-31.

{¶13} Statements given to police officers are testimonial when "the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Davis*, 547 U.S. at 822. Because some statements made to persons other than police officers may be testimonial in nature, they are not categorically excluded from the scope of the Confrontation Clause, but that fact is "highly relevant." *Ohio v. Clark*, 576 U.S. 237, 249 (2015). "Statements made to someone who is not principally charged with uncovering and prosecuting criminal behavior are significantly less likely to be testimonial than statements given to law enforcement officers." *Id*. As with statements given to law enforcement, the primary purpose test controls. *See id.* at 245-246. The primary purpose test is an objective inquiry that takes into account the totality of the surrounding circumstances. *See State v. Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, ¶ 156. Relevant circumstances that bear on the primary purpose inquiry are the identity

of the questioner, the existence of an ongoing emergency, the relative informality of the setting, and application of traditional rules regarding hearsay to the statements at issue. *See Clark* at 244-245, 249.

{¶14} Orlando argues that the trial court erred by denying his motion to sever because the anticipated testimony of B.H., a fact witness called by the State, included statements made to her by Donyea that were circumstantial evidence tending to prove that he participated in the crimes charged against him. Specifically, B.H., who did testify at trial, explained that several weeks after the events in question, Orlando and Donyea were present in her home, where they sat on either side of her on a sectional sofa during a conversation. According to B.H.'s testimony, Donyea expressed concern about C.J.'s recent arrest and asked B.H. "if [C.J.]'s going to keep it silent, keep it 100." B.H. explained that by asking this question, Donyea inquired whether C.J. would disclose what she knew about the crimes, although he did not specifically reference murder. B.H. also explained that although Donyea did the talking, Orlando "always kind of nodded and said yes."

{¶15} Donyea's statements were made in an informal setting to an acquaintance with no connection to law enforcement. Like statements made to a friend while incarcerated or to a fellow inmate, these statements were not testimonial in character. *State v. Henderson*, 7th Dist. Mahoning No. 16 MA 0057, 2018-Ohio-5124, ¶ 38; *Carter*, 2017-Ohio-7501, at ¶ 36-39; *Newsome*, 2012-Ohio-6119, at ¶ 31. Consequently, the Confrontation Clause was not implicated, and *Bruton* did not require the trial court to sever Orlando's trial based upon them. *See Carter* at ¶ 39; *Newsome* at ¶ 31, 33. Orlando Tyus' first assignment of error is overruled.

### ASSIGNMENT OF ERROR NO. 2

THE TRIAL COURT ERRED IN ADMITTING OVERLY GRUESOME PHOTOGRAPHS OF VICTIM [R.M.], IN VIOLATION OF THE 5TH, 6TH, AND 14TH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ART. 1, §10, OF THE OHIO CONSTITUTION.

{¶16} Orlando Tyus' second assignment of error is that the trial court erred by admitting autopsy photographs that showed the path of the bullet that caused the death of R.M. This Court does not agree.

{¶17} The admissibility of gruesome photographs in a noncapital case is considered with reference to Evid.R. 403. *See State v. Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, ¶ 95-96, quoting *State v. Morales*, 32 Ohio St.3d 252, 257-258 (1987) (observing that such photographs are generally considered subject to Evid.R. 403, but that "a stricter evidentiary standard" applies in capital cases). Under Evid.R. 403(A), otherwise relevant evidence "is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." The exclusion of relevant evidence under Evid.R. 403(A) rests within the discretion of the trial court. *State v Skatzes*, 104 Ohio St.3d 195, 2004-Ohio-6391, ¶ 107, citing *State v. Sage*, 31 Ohio St.3d 173 (1987), paragraph two of the syllabus. When considering a trial court's decision to exclude evidence under Evid.R. 403(A), this Court is "mindful that 'the exclusion of evidence under Evid.R. 403(A) is even more of a judgment call than determining whether the evidence has logical relevance in the first place.'" *State v. Thompson*, 9th Dist. Wayne No. 15AP0016, 2016-Ohio-4689, ¶ 25, quoting *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, ¶ 40. *See also State v. Maurer*, 15 Ohio St.3d 239, 264-265 (1984) (describing a trial court's broad discretion under Evid.R. 403 in the admission of photographs).

{¶18} "'Autopsy photographs are generally admissible to help the jury appreciate the nature of the crimes, to illustrate the coroner's or other witnesses' testimony by portraying the wounds, to help prove the defendant's intent, and to show the lack of accident or mistake.'" *State v. Buck*, 9th Dist. Summit No. 27597, 2017-Ohio-273, ¶ 22, quoting *State v. Costell*, 3d Dist. Union

No. 14-15-11, 2016-Ohio-3386, ¶ 142. Consequently, autopsy photographs—even if gruesome—are not per se inadmissible. *Maurer* at 265. *See also State v. Baskerville*, 9th Dist. Summit No. 28148, 2017-Ohio-4050, ¶ 33.

{¶19} Orlando objected to the admission of State's Exhibits 48B and 48C. State's Exhibit 48B depicts the interior of R.M.'s skull with the brain removed. State's Exhibit 48C is similar except that in that photograph, a portion of the base of the skull bone has been removed to locate where the bullet lodged. State's Exhibit 48C also depicts a metal rod that was inserted to demonstrate the path of the bullet. The trial court acknowledged the gruesome nature of the photographs, but admitted them because they were relevant to demonstrating the cause of R.M.'s death.

{¶20} Although gruesome, State's Exhibits 48B and 48C served to illustrate the testimony of Dr. Lisa Kohler, the Chief Medical Examiner who testified about the autopsy of R.M.'s body. Dr. Kohler testified that R.M. was killed by a single gunshot wound to the head. She noted that the bullet entered "just on the inside angle of the right eye" and travelled through the sinus and the base of skull to where it lodged. Dr. Kohler explained that the bullet never entered the brain cavity, but that R.M.'s death was caused by a combination of blood loss and injury to the brain caused by "concussive forces" that resulted from the trajectory of the bullet. As Dr. Kohler explained,

> As the bullet passes through anything, it releases energy so there's a big expanse of energy around it and that is shown in that he had some bruising to the brain near where the wound trac[k] was although the bullet never actually got into the cavity where the brain is housed.

Dr. Kohler further distinguished a gunshot wound that results in a bullet that enters the brain and results in a "fairly quick" death from R.M.'s wound, which may have caused death within "a series of minutes[]" during which "[h]e may have been able to have some function for a short period of time."

{¶21}  This testimony could, understandably, cause confusion in the minds of jurors with respect to the possibility that a bullet could enter near the eye socket, travel through the sinuses, and lodge near the base of the skull without penetrating the brain itself.  State's Exhibits 48B and 48C depict the physical pathway that the bullet took, and therefore serve to illustrate Dr. Kohler's testimony and to eliminate any such confusion on the part of the jurors.  The probative value of these photographs was not substantially outweighed by the danger of unfair prejudice under Evid.R. 403(A), and the trial court did not abuse its discretion by admitting the photographs.

{¶22}  Orlando Tyus' second assignment of error is overruled.

### ASSIGNMENT OF ERROR NO. 4

THE TRIAL COURT COMMITTED PLAIN ERROR BY ADMITTING PHOTOGRAPHS OF DONYEA TYUS WITH A GUN, IN VIOLATION OF THE 5TH, 6TH, AND 14TH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ART. 1, §10, OF THE OHIO CONSTITUTION.

{¶23}  In his fourth assignment of error, Orlando Tyus argues that the trial court erred by admitting two photographs of Donyea in possession of a firearm despite the fact that they had no probative value.  Orlando acknowledges that trial counsel did not object to the admission of the photographs, so he has forfeited all but plain error.  *See* Crim.R. 52(B).

{¶24}  Crim.R. 52(B) permits this Court to notice plain errors or defects that affected a substantial right in the absence of an objection in the trial court.  This Court can only notice plain error when there has been a deviation from a legal rule that constitutes an obvious defect in the trial proceedings that affected the outcome of the trial.  *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002).  This Court notices plain error only in exceptional circumstances to prevent a manifest miscarriage of justice.  *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

{¶25}  Orlando argues that the trial court committed plain error by admitting State's Exhibits 8K and 8L, which are two photographs extracted from a cellular phone collected when

Donyea was arrested. The photographs depict Donyea holding a firearm with the muzzle pointed toward the camera. They were introduced during the testimony of Dylan Matt, an employee of the Ohio Bureau of Criminal Investigation who examined the bullets and bullet fragments collected in the course of the investigation and prepared several reports explaining his findings.

{¶26} Under Evid.R. 401, evidence is relevant as long as it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. Relevance is, therefore, broadly defined. *State v. McGuire*, 80 Ohio St.3d 390, 400 (1997). Mr. Matt testified that based on his examination, three bullets were likely to have been fired from the same weapon: the first two were spent shell casings collected from the scene where B.R. was shot, and the third was a bullet recovered from B.R.'s body. Mr. Matt further explained that the only firearm known to produce the distinctive combination of markings on those bullets was manufactured by Hi-Point. With respect to the photographs—and, in particular, State's Exhibit 8L—Mr. Matt testified that the photograph "appears to show the muzzle end of a firearm that has the general profile of a Hi-Point firearm * * *." He also, however, qualified his testimony by explaining that he did not examine any firearms submitted in this case and that he could not see the make, model, caliber, or any other information from the side of the weapon depicted in the photograph. The testimony of other witnesses connected both Orlando and Donyea to the entire sequence of events and, in particular, identified Orlando as the individual who shot B.R.

{¶27} Thus, this Court cannot agree with Orlando's broad assertion that State's Exhibits 8K and 8L had no probative value. Our inquiry does not end at that point, however, because under Evid.R. 403(A), otherwise relevant evidence "is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of

misleading the jury." In this respect, the admission of these photographs is more troubling. Given the balance of the testimony at trial, however, including the testimony of an eyewitness to the events, we cannot conclude that the admission of State's Exhibits 8K and 8L affected the outcome of Orlando's trial. *See Barnes*, 94 Ohio St.3d at 27.

{¶28} The trial court did not commit plain error in the admission of these exhibits, and Orlando Tyus' fourth assignment of error is overruled.

### ASSIGNMENT OF ERROR NO. 3

ORLANDO TYUS WAS DENIED HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE 6TH AMENDMENT TO THE U.S. CONSTITUTION AND ARTICLE I, §§ 1, 10 & 16 OF THE OHIO CONSTITUTION WHEN COUNSEL DID NOT OBJECT TO UNDULY PREJUDICIAL PHOTOGRAPHS OF THE CO-DEFENDANT.

{¶29} Orlando Tyus' third assignment of error argues that he was denied the effective assistance of counsel because trial counsel failed to object to the admission of State's Exhibits 8K and 8L.

{¶30} In order to demonstrate ineffective assistance of counsel, a defendant must show (1) deficiency in the performance of counsel "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" and (2) that the errors made by counsel were "so serious as to deprive the defendant of a fair trial[.]" *Strickland v. Washington*, 466 U.S. 668, 687 (1984). A defendant must demonstrate prejudice by showing that, but for counsel's errors, there is a reasonable possibility that the outcome of the trial would have been different. *Id*. at 694. "A defendant's failure to satisfy one prong of the *Strickland* test negates a court's need to consider the other." *State v. Madrigal*, 87 Ohio St.3d 378, 389 (2000), citing *Strickland* at 697.

{¶31}   This Court has determined that the admission of State's Exhibits 8K and 8L, even if erroneous, did not affect the outcome of Orlando's trial.   As such, Orlando cannot demonstrate that the outcome of his trial would have been different had counsel objected to their admission. His third assignment of error is overruled on that basis.

ASSIGNMENT OF ERROR NO. 5

THE TRIAL COURT ERRED IN THE HAVING WEAPON WHILE UNDER DISABILITY JURY INSTRUCTION, IN VIOLATION OF THE 5TH, 6TH, AND 14TH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ART. 1, §10, OF THE OHIO CONSTITUTION.

{¶32}   In his fifth assignment of error, Orlando Tyus has argued that the trial court erred by instructing the jury using language that tracked the wording of R.C. 2923.13(A)(2). Specifically, Orlando has argued that the trial court abused its discretion by instructing the jury that he had previously been convicted of a crime of violence instead of merely reiterating the parties' stipulation that he was under a disability.   This Court does not agree.

{¶33}   "[A] trial court must fully and completely give the jury all instructions which are relevant and necessary for the jury to weigh the evidence and discharge its duty as the fact finder." *State v. Comen*, 50 Ohio St.3d 206 (1990), paragraph two of the syllabus; R.C. 2945.11 ("In charging the jury, the court must state to it all matters of law necessary for the information of the jury in giving its verdict.").   Although trial courts enjoy broad discretion in fashioning jury instructions, they must "present a correct, pertinent statement of the law that is appropriate to the facts." *State v. White*, 142 Ohio St.3d 277, 2015-Ohio-492, ¶ 46, citing *State v. Griffin*, 141 Ohio St.3d 392, 2014-Ohio-4767, ¶ 5, and *State v. Lessin*, 67 Ohio St.3d 487, 493 (1993).   This Court reviews a trial court's decision to provide a requested jury instruction for an abuse of discretion. *State v. Simin*, 9th Dist. Summit No. 26016, 2012-Ohio-4389, ¶ 40, quoting *State v. Evans*, 9th Dist. Medina No. 07CA0057-M, 2008-Ohio-4772, ¶ 12.   An abuse of discretion is present when a

trial court's decision "'is contrary to law, unreasonable, not supported by evidence, or grossly unsound.'" *Menke v. Menke*, 9th Dist. Summit No. 27330, 2015-Ohio-2507, ¶ 8, quoting *Tretola v. Tretola*, 3d Dist. Logan No. 8-14-24, 2015-Ohio-1999, ¶ 25.

{¶34} Applying federal law, the United State Supreme Court has determined that a trial court errs by refusing to accept a defendant's stipulation of a prior conviction for purposes of possessing a weapon under disability and, instead, permitting proof of the fact by means of the conviction itself. *Old Chief v. U.S.*, 519 U.S. 172, 174 (1997). In *State v. Creech*, 150 Ohio St.3d 540, 2016-Ohio-8440, the Ohio Supreme Court reached a similar conclusion applying Ohio law:

> Pursuant to Evid.R. 403, in a case alleging a violation of R.C. 2923.13, when the name or nature of a prior conviction or indictment raises the risk of a jury verdict influenced by improper considerations, a trial court abuses its discretion when it refuses a defendant's offer to stipulate to the fact of the prior conviction or indictment and instead admits into evidence the full record of the prior judgment or indictment when the sole purpose of the evidence is to prove the element of the defendant's prior conviction or indictment.

*Id.* at ¶ 40. In this case, the trial court did not refuse to accept Orlando's stipulation regarding his prior conviction in favor of admitting the complete record of his conviction, so the Ohio Supreme Court's analysis in *Creech* does not apply directly to the matter at hand. Nonetheless, Orlando suggests that *Creech* should inform this Court's analysis because "the concerns raised in *Creech* are applicable to this circumstance[]." Specifically, he maintains that just as admission of a conviction could violate Evid.R. 403(A) because of unfair prejudice, a jury instruction that provides details beyond the fact that the defendant has stipulated that he committed a crime that disabled him from possessing a weapon may also result in unwarranted prejudice that demonstrates an abuse of discretion.

{¶35} In *Creech*, the Ohio Supreme Court adopted the reasoning of *Old Chief*, but emphasized that R.C. 2923.13 is distinguishable from its federal counterpart:

What mattered for purposes of the federal statute is that the defendant had been sentenced to a crime punishable with a sentence of more than a year in prison. The General Assembly in R.C. 2923.13 made some distinctions in determining the classes of crimes that should bar a convict from possessing a gun, but the classes are still broad. What matters to the General Assembly—and an element that the state must prove—is that the crime the defendant was convicted of was either a "felony offense of violence" or a "felony offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse." R.C. 2923.13(A)(2) and (3). *In regard to R.C. 2923.13, a stipulation or admission concerning the status element would necessarily include the fact that the defendant was under indictment or had previously been convicted of a crime falling within those broad categories*.

(Emphasis added.) *Creech* at ¶ 35. Consequently, a jury instruction that recites that the defendant has been convicted of a "felony offense of violence" under R.C. 2923.13(A)(2), as the trial court provided in this case, includes precisely the information required for a "correct, pertinent statement of the law." *See White*, 142 Ohio St.3d 277, 2015-Ohio-492, at ¶ 46, citing *Griffin*, 141 Ohio St.3d 392, 2014-Ohio-4767, at ¶ 5, and *Lessin*, 67 Ohio St.3d at 493.

{¶36} The trial court did not abuse its discretion by instructing the jury that Orlando had been "previously convicted of a felony offense of violence[.]" Orlando Tyus' fifth assignment of error is overruled.

### ASSIGNMENT OF ERROR NO 6.

ORLANDO TYUS' CONVICTIONS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN VIOLATION OF THE 5TH AND 14TH AMENDMENTS TO THE U.S. CONSTITUTION AND ARTICLE I, §§ 1, 10 & 16 OF THE OHIO CONSTITUTION.

{¶37} Orlando Tyus' final assignment of error argues that his convictions were against the manifest weight of the evidence. This Court does not agree.

{¶38} When considering whether a conviction is against the manifest weight of the evidence, this Court must:

review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the

evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). A reversal on this basis is reserved for the exceptional case in which the evidence weighs heavily against the conviction. *Id.*, citing *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). The identity of a perpetrator must be proved by the State beyond a reasonable doubt. *State v. Flynn*, 9th Dist. Medina No. 06CA0096-M, 2007-Ohio-6210, ¶ 12. As with any element of an offense, identity may be proved by direct or circumstantial evidence, which do not differ with respect to probative value. *Id. See also State v. Treesh*, 90 Ohio St.3d 460, 485 (2001), citing *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph one of the syllabus.

{¶39} Orlando's only argument regarding manifest weight is that the State's evidence that identified him as one of the perpetrators was unreliable and unverified by any scientific evidence. Specifically, Orlando has argued that the witnesses who identified him as one of the shooters were known drug users whose testimony was influenced by favorable treatment by the State.

{¶40} Officer Timothy White testified that he arrived at a scene on Schiller Avenue in response to a 911 call that was placed at 3:39 a.m., where officers found that B.R. had been shot in the back of the head. It appeared that B.R.'s brother, C.R., was the only witness to the shooting, but C.R. offered limited information and appeared to be "[v]ery erratic; very shocked; scared, traumatic." It was also apparent that C.R. had been consuming alcohol. According to Officer White, C.R. suspected that the individuals had fled on foot towards Tallmadge Avenue. C.R. also mentioned that one of the individuals was wearing an army-style fabric hat. Officer White located and detained three individuals in the vicinity, one of whom was wearing a hat and one of whom was covered in blood. Officer White later recognized that individual as a man who had been near

B.R.'s body attempting to render assistance. The three individuals were ultimately released without charges.

{¶41} C.R. also testified at trial. He acknowledged that he had consumed alcohol on the evening of the events, but nonetheless offered a basic description of what transpired. C.R. explained that he and B.R. drove to a cousin's house on the evening of July 6, 2018, and B.R. parked his car along the street. He testified that when they decided to leave, they walked together to B.R.'s parked car. C.R. made it to the passenger door, but a person approached him from the rear and demanded his money. He recalled that the individual was a black male wearing an army hat, but could offer no further description. C.R. saw another person on the driver's side of the vehicle and heard four shots as he saw that person shoot his brother.

{¶42} Officers recovered three spent shell casings from the scene of B.R.'s death, as well as one live round of ammunition. According to Sergeant Robert Miller, those findings were consistent with at least three shots being fired and one "jam or * * * misfire." The live bullet had markings consistent with being struck by a firing pin. Mr. Matt, who described his ballistics analysis, testified that two of the spent cartridges and a bullet recovered from B.R.'s body were fired by the same weapon. He also explained that a live round can be marked by a firing pin when the firing pin fails to strike the primer with enough force to detonate it, but leaves an indentation nonetheless.

{¶43} The body of R.M. was found in a parking lot near the intersection of 5th Avenue and Arlington Street. The person who reported the body to police did not witness the shooting, but she reported to police that she may have seen the victim alive between 3:20 a.m. and 4:00 a.m. A single bullet was recovered from R.M.'s body; according to Mr. Matt, that bullet was not fired from the same weapon that fired the bullets recovered from the scene of B.R.'s shooting.

{¶44} While canvassing the neighborhood where R.M.'s body was found, police encountered C.H., who reported that someone offered her drugs; lured her into Minordy Place, an alley that intersects with 6th Avenue in the vicinity of 5th Avenue and Arlington; and attempted to shoot her. The officers testified that C.H. took them to the location of the attempted shooting because she believed they would find bullets that had fallen from the gun. They recovered two live rounds of ammunition from the alley. Mr. Matt, who examined the bullets, determined that one bore marks consistent with a light firing pin strike, while the other did not.

{¶45} C.H. testified during the trial. She acknowledged that she has an extensive criminal record consisting of drug and prostitution-related charges and testified that she was working as a prostitute on the evening in question. C.H. recalled that she was working near the corner of 6th Avenue and Arlington at approximately an hour before sunrise when a black male called out to her, referring to her as "Auntie," summoning her to the other side of the street while holding up a baggie that she believed to hold crack cocaine. She testified that she resisted his invitation to step into a darker location, but acknowledged that she was hoping to obtain some drugs. C.H. recalled that the man grabbed her arm and pulled her into the alley, knocking her to the ground. She testified that after she stood up, she saw a white woman with blond hair and another black man.

{¶46} C.H. testified that the woman turned around, pulled a gun from her waistband, and pointed it at her. C.H. indicated that the woman appeared to be acting on her own volition. One of the men grabbed the gun from the woman, held it to C.H.'s head, and said, "Are you ready to die?" C.H. testified that she pleaded with the man not to shoot her because she has children, but she recalled that the man responded, "So what, Bitch. I have kids, too." She recalled that the man pulled the trigger two times: the first time, the clip fell out and the second time, bullets were expelled. When the man stooped to pick up the bullets, C.H. attempted to flee, but one of the men

tripped her and the woman jumped on top of her. C.H. testified that she fought the woman off, then fled. She recalled that she saw the men fleeing down the alley as well.

{¶47} Lieutenant Scott Lietke investigated the three incidents. Although three individuals were originally taken into custody at the scene of B.R.'s shooting, Lieutenant Lietke explained that he was less confident in their involvement after he spoke with them. Lieutenant Lietke testified that he did not make solid progress with the investigation until members of the Summit County Drug Task Force told him that a potential confidential informant had disclosed that she had information related to a homicide. Lieutenant Lietke interviewed that individual, a woman named B.H., at the Akron Police Department. He emphasized that although he was aware that she had a deal with the drug task force, he communicated clearly to her that she could expect nothing from him. According to Lieutenant Lietke, B.H. disclosed that her acquaintance, C.J., was involved with the shootings along with brothers identified as "Orka" and "Bishop." At that time, B.H. described a conversation that she had with the men and provided information from her cellular phone that enabled the identification of "Orka" as Orlando and "Bishop" as Donyea. Lieutenant Lietke testified that shortly thereafter, he arranged for an interview with C.J., who was in jail at the time. He explained that he showed C.J. pictures of the victims—then pictures of Orlando and Donyea —and that she expressed concern for her safety, but proved to be cooperative. Lieutenant Lietke testified that police followed up with C.H. after his interviews with B.H. and C.J. She identified C.J. from a photo array as the woman who pulled a gun on her in the alley, but failed to identify either Orlando or Donyea.

{¶48} Both B.H. and C.J. ultimately testified at trial. Like C.J., B.H. acknowledged that she is a drug user. She identified "Orka" as Orlando and "Bishop" as Donyea and testified that they are drug users as well. B.H. testified that she had conversations with C.J. after July 7, 2018,

that led her to believe that C.J. feared the two men and that her safety was at risk. Specifically, B.H. testified that C.J. disclosed to her that she had participated in a series of shootings with Orlando and Donyea as a gang initiation. C.J. specifically told her that both men had killed their intended victim, but the gun had later malfunctioned. Consequently, according to B.H., she attempted to protect C.J. by shielding her in her own home. B.H. explained that she had multiple conversations with C.J. about the murders between July 7, 2018, and August 9, 2018, when B.H. was arrested on drug charges. She also testified that, as described in our discussion of Orlando's first assignment of error, several weeks after the shootings, Orlando and Donyea were present in her home, where they sat on either side of her on a sectional sofa during a conversation. According to B.H.'s testimony, Donyea expressed concern about C.J.'s recent arrest and asked B.H. "if [C.J.]'s going to keep it silent, keep it 100." B.H. explained that by asking this question, Donyea inquired whether C.J. would disclose what she knew about the crimes, although he did not specifically reference murder. B.H. also explained that although Donyea did the talking, Orlando "always kind of nodded and said yes."

{¶49} C.J., like other witnesses, acknowledged that she suffered from a drug addiction; at the time of these events, she was regularly using methamphetamine and fentanyl. She testified that in the early hours of July 7, 2018, she agreed to go out with Donyea and Orlando after doing a shot of fentanyl to avoid getting sick. She testified that both men had guns on their person, but that she was accustomed to seeing them with weapons. She also explained that she and the men each carried a cellular phone. C.J. testified that both men wore dark clothes and that Donyea wore a hat that she described as a "drill sergeant hat." According to C.J., Orlando drove the car, Donyea rode in the passenger seat, and she rode in the back seat.

{¶50} C.J. testified that Orlando drove north from her place of residence at Hammel and Crosier in Akron to the north side of Akron. As they drove, Orlando and Donyea discussed targeting random people "so it [wouldn't] be tracked back to them." C.J. explained that they parked on a side street and then, when Orlando and Donyea saw two Asian men walking to a car parked in front of them, the men got their weapons and told her to stay in the car. According to C.J.'s testimony, Orlando approached the man on the driver's side of the car, and Donyea approached the man on the passenger side. She testified that when Donyea approached the passenger, he demanded money, but Orlando did not say anything. Donyea raised his gun and pulled the trigger, but the gun did not fire. Orlando, on the other hand, fired his weapon three or four times, and the man by the driver's side of the car dropped to the ground. When the men returned to the car, Donyea asked for Orlando's gun, but Orlando said, "[N]o, just get in the car. We got to go."

{¶51} C.J. testified that they drove from the scene in a direction that took them away from Tallmadge Avenue. She explained that they got back onto the highway and drove to Arlington and 5th Avenue on the east side of Akron. As they drove, both Orlando and Donyea referenced rap lyrics—"'body for body.'" C.J. testified that when they parked, Orlando and Donyea cleaned their guns, then the three left the car and walked toward Arlington. She explained that "Donyea was stating how he was mad because he didn't get his body so the next guy that he seen he was going to get him." C.J. testified that as she and Orlando waited behind a fence, Donyea approached a man, shook his hand, then raised his gun to the man's head and pulled the trigger. When Donyea returned, he informed Orlando and C.J. that he knew the individual from prison.

{¶52} C.J. testified that after Donyea shot the man, "they told me that since I just witnessed them kill two people, that if I didn't do the same thing, then that's what would happen

to me." She explained that they framed the events in terms of an initiation. After this conversation, C.J. testified, the three crossed Arlington onto a side street, where they saw a woman walking down the street. C.J. testified that the men called her "[A]untie" and tried to lure her closer. She recalled that Orlando had pulled baggies out, and that the woman had her back to her and Donyea when she approached. C.J. testified that Donyea handed her a gun, "[a]nd at that point I put the gun to her head and I pull[ed] the trigger and it doesn't go off." C.J. explained what happened next:

> And at that point, she turns around and she sees the gun and she starts, you know, begging for her life. And she's like please, don't. I have kids. And at this point I passed the gun to Donyea and he cocked it back and he said, "Bitch, I have kids, too." And he tried to fire the gun and it still didn't go off.
>
> And she tried to run. And Orlando tripped her and they told me to grab her and so I grabbed her and at that point she kicked me and she was able to get away.

C.J. testified that it was her intention to fire the gun at C.H.'s head when she pulled the trigger, although she acknowledged prior statements to the contrary. She also testified that Orlando and Donyea sent her back to the alley to retrieve the baggies that had been left behind and that she tried to avoid them as she walked back. Again, however, C.J. acknowledged that previous statements omitted this detail. She also acknowledged that she had been charged with felonious assault in connection with the attempted shooting of C.H. and had entered into a plea agreement that required her to testify "truthfully, completely and accurately[.]".

{¶53} Chris Miller, the Public Information Officer for Lorain Correctional Institution, testified regarding prison records for Donyea and R.M. According to those records, Donyea and R.M. had common locations within the Ohio Department of Corrections and Rehabilitations on several occasions, including a period of time from December 8, 2015, to January 19, 2016, when

they were bunked only two beds apart at the Richland Correctional Institution, a dormitory-style facility.

{¶54} Special Agent Jacob Kunkle, who works with the Cellular Analysis Survey Team in the Cleveland office of the Federal Bureau of Investigation, testified that he conducted an analysis of cellular phone records in connection with this case. Agent Kunkle explained that when a cellular phone receives or initiates a call, the signal is picked up by a nearby tower chosen by the phone to optimize signal clarity and strength. He acknowledged that it is not possible to trace the precise path that a phone takes using this analysis, but he also explained that by examining historical cellular records, it is possible to estimate the location of a cellular phone relative to available towers if the phone was in use.

{¶55} Agent Kunkle testified that according to his analysis, a cellular phone taken from Orlando after his arrest and a cellular phone connected to Donyea were located in the general area of East Crosier and Hammel on the south side of Akron shortly after 3:00 a.m. on July 7, 2018. Agent Kunkle explained that his analysis indicated that both cellular phones moved north sometime between 3:08 a.m. and 3:38 a.m., when towers located in the vicinity of Schiller Avenue picked up activity from the phones. The phone associated with Orlando then traveled south again, sometime between 3:38 a.m. and 4:53 a.m., where it was picked up by a tower near the intersection of Route 8 and Interstates 76 and 77.

{¶56} As Orlando argues, three of the State's witnesses acknowledged frequent drug use; the same three witnesses acknowledged their criminal records. Both B.H. and C.J., as Orlando also argues, had some incentive to cooperate with the police in their investigation of this case. Although these facts do bear on the credibility of a witness, they do not stand in isolation. In this case, B.H.'s testimony, although of less detail, was mostly consistent with the testimony provided

by C.H., the victim of the final shooting attempt. C.J.'s testimony was also notable for the details that were consistent with details that C.R. and C.H. provided and with the physical evidence. As Lieutenant Lietke explained during trial, C.J. provided details that "you could only have known if you were there." Orlando also maintains that the State's case was not persuasive because it lacked the support of scientific or forensic evidence. Such evidence, however, is not required to obtain a conviction. *Compare State v. Finley*, 2d Dist. Montgomery No. 19654, 2004-Ohio-661, ¶ 31-36.

**{¶57}** This Court must "'consider[] the credibility of witnesses'" as part of our manifest weight review. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *Martin*, 20 Ohio App.3d at 175. Nonetheless, this Court is mindful of the well-established principle that a trier of fact enjoys the best position to assess the credibility of witnesses. *State v. Rivera*, 9th Dist. Lorain No. 18CA011263, 2019-Ohio-62, ¶ 39, quoting *State v. Johnson*, 9th Dist. Summit No. 25161, 2010-Ohio-3296, ¶ 15. Given the evidence in this case, this Court cannot conclude that this is the exceptional case in which the evidence weighs heavily against the convictions.

**{¶58}** Orlando Tyus' sixth assignment of error is overruled.

III.

**{¶59}** Orlando Tyus' assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

_____
LYNNE S. CALLAHAN
FOR THE COURT

SCHAFER, J.
TEODOSIO, J.
CONCUR.

APPEARANCES:

JEREMY A. VEILLETTE, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN R. DIMARTINO, Assistant Prosecuting Attorney, for Appellee.